MEREK S. RUBIN *vs.* MARY LOU RUBIN.

No. 89-P-514.

Worcester. April 11, 1990. - January 9, 1991.

Present: PERRETTA, SMITH, & FINE, JJ.

*Divorce and Separation*, Separation agreement. *Contract*, Separation agreement.

In a divorce action, the question of the validity and applicability of a "separation" agreement was properly considered before entry of the final judgment of divorce. [690]

The judge in a divorce action properly concluded based on findings of fact that had ample support in the evidence that a "separation" agreement signed by the parties upon an earlier reconciliation was unenforceable because its provisions were not fair and reasonable and because it was procured through coercion, and the judge properly declared the agreement null and void. [695-698]

COMPLAINT for divorce filed in the Worcester Division of the Probate and Family Court Department on April 21, 1988.

The case was heard by *Arline S. Rotman*, J.

*Paul M. Kane* for Merek S. Rubin.

*Michael J. Norris* for Mary Lou Rubin.

PERRETTA, J. After six years of marriage, the husband (Merek) brought a complaint for divorce under G. L. c. 208, § 1B. The judge entered a temporary order for spousal and child support in an amount which exceeded that provided for in a "separation" agreement signed by the parties a year earlier upon their reconciliation but now challenged by the wife (Mary Lou) as unfair, unreasonable, and the product of coercion and duress. Merek sought relief under the first paragraph of G. L. c. 231, § 118. A single justice of this court entered an order for a separate trial of the "question of the validity and applicability of the agree-

ment." After trial on that issue, the probate judge concluded that the agreement was not fair and reasonable and that it was null and void. On Merek's appeal from the ensuing judgment, which was certified under Mass.R.Dom.Rel.P. 54(b) (1975), we conclude that the judge's findings are supported by the evidence and available inferences and free of any error of law. We, therefore, affirm the judgment.

1. *The Status of the Agreement.*

By its own terms, the agreement was to be incorporated into, but not merged with, any judgment of divorce.[1] Consequently, the agreement is "valid and binding, and specifically enforceable, 'absent countervailing equities,' when a judge determines, at the time of the entry of a judgment of divorce nisi or thereafter, that the agreement was free of fraud and coercion and fair and reasonable at the time of the entry of the judgment, and that the parties agreed on the finality of the agreement. See *Knox* v. *Remick*, 371 Mass. 433, 436-437 (1976); *Stansel* v. *Stansel*, 385 Mass. 510, 514-515 (1982); *Moore* v. *Moore*, 389 Mass. 21, 24 (1983). Cf. *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981)." *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 91 (1984). If the issue of the status of the agreement appears to have been raised somewhat prematurely, as compared to the timing in the cases cited in *Dominick*, we point out that, almost immediately after filing his complaint, Merek requested a hearing "to determine the applicability and validity of the agreement to the . . . complaint for divorce." Although Merek's motion was denied by a Probate Court judge, the single justice's order for bifurcation accomplished what Merek sought.

2. *The Provisions of the Agreement and its Execution.*

In concluding that she would not enforce the agreement, because its provisions were not fair and reasonable and because it was procured through coercion, the judge made de-

---

[1] The agreement provides, in relevant part: "In the event that hereafter a judgment of divorce is entered . . . this Agreement may be made a part of such judgment if the court so allows; but in no event shall the within Agreement merge in said judgment. This Agreement shall at all times be construed as an Agreement having independent legal significance."

tailed and comprehensive findings of fact which have ample support in the evidence.[2] We, therefore, relate the facts as the judge found them.

Merek became a member of the Massachusetts bar in 1967, and thereafter received an advanced degree in the law of taxation. At first a sole practitioner, he employed another attorney in 1980, with whom, in 1982, he formed a partnership. When a third attorney joined them in 1986, they organized a professional corporation. Merek has a seventy-five percent ownership interest in the corporation, and his practice is focused upon corporate and estate planning matters. In addition, Merek has other ownership interests in ventures unrelated to his legal practice.

Mary Lou met Merek in 1974, when she went to work in his office. She was a high school graduate and had attended a junior college for a year and one-half.[3] At the time she began working for Merek, she and her first husband had recently separated and were later divorced. She had custody of her two children, now teenagers, by that marriage, and they have always resided with her.

In 1980, prior to Merek's divorce from his first wife, Mary Lou purchased a house in Southborough, taking title to that property in her name alone. She contributed about $10,000 towards the purchase price of $119,000. The balance was financed with mortgages paid by Merek. The purchase was handled in this fashion because, as testified to by Merek, he did not want his "first wife making a claim on the house" during their divorce proceedings.[4]

Shortly after his divorce in December, 1981, Merek and Mary Lou took title to the Southborough property, which ul-

---

[2]Merek's claim that certain findings are clearly erroneous does not warrant detailed discussion. For the most part, the argument is no more than disagreement with the judge's determination as to whom to believe and whether to draw available inferences. In those instances where we found error, it was on inconsequential matters.

[3]Throughout the years, Mary Lou has taken continuing education courses. In May, 1988, she enrolled in college as a full-time student, concentrating her studies in elementary education.

[4]There is one child of that marriage who resides with Merek's former wife, to whom Merek pays $600 a month for child support.

timately became their marital residence, as joint tenants. They married on July 3, 1982.

After the marriage, Mary Lou continued to work for Merek. Her responsibilities increased. She did paralegal work and the bookkeeping. In 1986, she served as the firm's comptroller. During the last three years of her employment by Merek, Mary Lou was earning over $20,000 a year.[5] While living and working together, Mary Lou and Merek kept their money separate. Merek gave her between $125 and $175 a week which, with her salary, she used to pay for the household operating expenses as well as her own and the children's personal expenses.

Major household expenses and the mortgage were paid by Merek. He has a current (1989) annual income of about $120,000. Additionally, the firm provides him with an automobile and pays all the expenses related to it. He also draws $125 a week for miscellaneous expenses, and there is a loan account, maintained by the firm, from and to which Merek borrows and loans money. As described by the judge, when the parties last lived together, they enjoyed an "upper-middle income" standard of living.

Marital discord began with Mary Lou's pregnancy in 1985. Merek was working long hours and spending little time at home. He became very irritable and abusive towards Mary Lou and the children, yelling and screaming, sometimes losing "complete control."

Just about a month before the birth of their son on June 11, 1986, Merek terminated Mary Lou's employment. Although he continued to give her about $200 a week for household expenses, she no longer had a salary to use for her own and her children's expenses.[6] From time to time, Merek would give her between $1,000 to $3,000 for household ex-

---

[5]Both Mary Lou and Merek earned larger than their normal salaries in 1985 but, as noted by the judge, that fact was attributable to a large fee received that year.

[6]Mary Lou was not enforcing her right to child support from her first husband.

penses, but Mary Lou did not have sufficient money without a salary. She found part-time employment.

The marital relationship continued to deteriorate. Merek's behavior became more volatile and, on one occasion, as he wildly ran about the house with their child, he accidentally banged the baby's head on a wall. Mary Lou, in a state of upset and depression, sought counselling, but Merek refused to join her. They separated for a few days in October and, again, in November, 1986.

On January 20, 1987, Merek left the marital residence and moved into a friend's apartment. During his absence, he continued to pay the mortgage. Mary Lou's only income at this time was her salary from her part-time work ($150 a week, gross) and some child support she was able to collect from her first husband ($330 a month). In order to obtain additional income, she worked briefly for a management company (while keeping her part-time work) and, then, she also took a position as a night auditor for a company, working from 11:00 P.M to 7:00 A.M. This job was taken primarily because it provided health insurance which Mary Lou feared Merek would discontinue. While working at these jobs, Mary Lou was also taking care of her three children.

Throughout this period, Mary Lou was, as found by the judge, "extremely tired, depressed, and under great physical strain." She and Merek were discussing divorce, including issues of alimony, child support, and property division. During these discussions, Mary Lou neither sought nor received legal advice. On March 20, Merek and Mary Lou went away for a weekend to try to work out a reconciliation.

During their weekend trip, Merek told Mary Lou that he would return to her on the condition that she sign a separation agreement which would embody the terms of their discussions and which would be binding upon them in the event that their reconciliation failed. By signing such an agreement, Merek told Mary Lou, she would prove that it was he rather than his money that she loved.

Although Mary Lou believed that she and Merek merely had discussions about an agreement but had not reached any

accord on specific terms, she was willing to make the required demonstration of her love for him. She was convinced that if Merek would return to her, they could resolve their difficulties and save their marriage.

Upon returning from the trip, Merek set to drafting an agreement with the assistance of an attorney in his law firm. By the terms of the agreement, Mary Lou would receive weekly alimony in the amount of $211 for a period of six months or until their child attained the age of thirty months, "whichever is later." Merek would also pay child support in the amount of $560 a month.[7] A schedule of Merek's assets, amounting to $1,300,000, was attached to the draft of the agreement, which also provided that Mary Lou would have ownership of the marital residence, in which there was about $160,000 in equity, as well as a small amount of stock. The agreement would expire within three years of the date of its execution unless divorce proceedings were commenced by either party during that period. In the event divorce proceedings were commenced, the agreement would take effect.[8] See note 1, *supra*.

Notwithstanding Mary Lou's willingness to sign the agreement proposed by Merek, who had returned to the marital residence on March 29, 1987, he insisted that she seek legal advice. When she did so, the attorney with whom she consulted refused to have anything to do with the agreement. Merek was very upset by the attorney's refusal, and he warned Mary Lou that there were to be no substantial changes in the terms of the agreement and that if she did not sign it, he would again vacate the marital residence.

Mary Lou turned to present counsel who was able to negotiate some changes: alimony was increased to $311 a week for one year, and provision was made for their son's educa-

[7]Merek testified that "at some point in 1987," he became aware of the fact that child support guidelines controlling child support payments would soon become effective and that the guidelines could call for weekly support in an amount greater than the monthly allowance provided for in the agreement.

[8]There was much more to the agreement. We have described only the most pertinent terms.

tion and health insurance. After giving her attorney a release from liability, Mary Lou; on April 10, 1987, took the agreement to a bank where she signed it before a notary public. She then met Merek who took the agreement and returned to his office where he signed it and had his signature notarized.

In January, 1988, Merek left the marital residence and moved into a condominium unit with another woman with whom he was residing at the time of trial. This woman was Merek's client and partner in a business unrelated to his law practice. She had signed a purchase and sale agreement for the condominium unit in 1986, and again in 1987. As her attorney, Merek knew that this woman did not have the money to buy the condominium unit which he purchased in March, 1988, as a substitute buyer under the 1987 purchase and sale agreement.

From January, 1988, until the time of the judge's temporary order, Merek paid Mary Lou in accordance with the terms of the agreement, that is, $311 a week in alimony and $560 a month in child support. As provided for in the agreement, Merek was to be relieved of his alimony obligation in January of 1989.

Entered on September 28, 1988, the temporary order obligates Merek to pay $600 a week in unallocated alimony and child support, to maintain medical insurance for Mary Lou and their child, and to be responsible for all the child's reasonable uninsured medical and dental expenses. Mary Lou's attorneys fees were to be taken into account "at the time of final hearing."

3. *The Refusal to Enforce the Agreement.*

By both her answer to Merek's divorce complaint and her motion for temporary support, Mary Lou repudiated the agreement. Her "repudiation of the agreement before the entry of judgment[] put the case in a posture equivalent to one in which a party to an agreement which survives a judgment of divorce nisi seeks specific performance so as to bar a complaint for modification of the judgment." *Dominick* v. *Dominick*, 18 Mass. App. Ct. at 92, citing *Knox* v. *Remick*, 371

Mass. at 436-437, and *Stansel* v. *Stansel*, 385 Mass. at 514-515.

In reaching the ultimate findings and conclusions that the "agreement does not make adequate provisions for child support or alimony," that the assignment of property was not based upon the factors set out in c. 208, § 34, and was "inadequate and incomplete," and that the agreement was the "product of duress and coercion,"[9] the judge applied to the facts which we have recited in some detail those considerations set out in *Dominick* v. *Dominick*, 18 Mass. App. Ct. at 92: "(1) the nature and substance of the objecting party's complaint; (2) the financial and property division provisions of the agreement as a whole; (3) the context in which the negotiations took place; (4) the complexity of the issues involved; (5) the background and knowledge of the parties; (6) the experience and ability of counsel; (7) the need for and availability of experts to assist the parties and counsel; and (8) the mandatory and, if the judge deems it appropriate, the discretionary factors set forth in G. L. c. 208, § 34 . . . [T]he judge is not required to divine what judgment he would likely enter if the case were fully litigated, but only whether the agreement is fair and reasonable when considered in light of the factors enumerated above and any other relevant circumstances [footnotes omitted]."

---

[9]More specifically, in respect to coercion, the judge found that after Merek left the marital residence on January 20, 1987, he knowingly refused to provide Mary Lou with enough money with which to maintain the household, that as a result, Mary Lou held numerous jobs, one at night, while also caring for their baby and the two children from her previous marriage, that she was "extremely tired, depressed, and under great physical strain during this time period," that Merek knew that Mary Lou was in a "weakened position" and that he "would not stay with her for the three years provided for in the agreement." See Restatement (Second) of Contracts § 177(1) and (2), and comments a and b (1981). See also 1 Lindey, Separation Agreements and Ante-Nuptial Contracts § 9.06 (1990). Cf. *Rosenberg* v. *Lipnick*, 377 Mass. 666, 671-672 (1979); *Osborne* v. *Osborne*, 384 Mass. 592, 595-599 (1981). Compare *Grindlinger* v. *Grindlinger*, 10 Mass. App. Ct. 823 (1980), where "sleeplessness and distraction" were caused by the fact of the divorce itself rather than by the deliberate actions of the spouse in order to gain bargaining advantages.

Applying these factors to the evidence found credible by the judge and the available inferences which she chose to draw from that evidence, we see neither an abuse of discretion nor error of law in her decision not to enforce the agreement.[10]

4. *Nullification of the Agreement.*

"Even where a judge of the Probate Court properly refuses specific performance and orders support (whether interspousal or child support) different from that called for in the agreement, the party aggrieved by that order has a claim for breach of contract." *DeCristofaro* v. *DeCristofaro*, 24 Mass. App. Ct. 231, 236-237 (1987), citing *Knox* v. *Remick*, 371 Mass. at 435-438. See also *Mansur* v. *Clark*, 25 Mass. App. Ct. 618, 620-621 (1988). Here, however, the judge took from Merek any right he might have had to bring an action at law under the agreement.[11] *Ibid.* Paragraph two of the judgment provides that the agreement "is hereby voided and of no further effect as it was a product of duress and coercion."

As made clear by the judge's findings of fact, this case involved far more than unfair and inadequate provisions arrived at by keen bargaining. By her pleadings, fairly read, and her proof, Mary Lou sought a cancellation of the agreement because her assent to it was obtained by Merek through a breach of his confidential relationship with her as well as by other unconscionable means. See note 9, *supra.* We see no error in the judgment. See *Anderson* v. *Anderson*, 354 Mass. 565 (1968). Compare *Moore* v. *Moore*, 389 Mass.

---

[10]Merek's argument that Mary Lou is barred from obtaining equitable relief by reason of her own conduct (see *Shikes* v. *Gabelnick*, 273 Mass. 201, 206-207 [1930]), entering into the agreement with the intention of never being bound by it, fails for the reason, if no other, that it is based upon a misunderstanding of her testimony. Although Mary Lou did testify that when she signed the agreement she never intended that it would be binding upon her, she also explained that upon entering into the agreement, she intended to make the reconciliation a lasting one and the contract, therefore, unnecessary.

[11]We think that any right lost by Merek could be regarded as more illusory than real in view of the judge's findings. See *Heacock* v. *Heacock*, 402 Mass. 21, 23-25 (1988); *Bagley* v. *Moxley*, 407 Mass. 633, 636-637 (1990); *Moat* v. *Ducharme*, 28 Mass. App. Ct. 749, 751-753 (1990).

21 (1983). Cf. *Wood* v. *Wood*, 369 Mass. 665, 670-671 (1976); *Patten* v. *Mayo*, 23 Mass. App. Ct. 657, 662 (1987).

*Judgment affirmed.*