STANLEY R. FOGG *vs.* GERALDINE FOGG.

Plymouth. February 4, 1991. - March 11, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Husband and Wife,* "Postnuptial" agreement. *Contract,* "Postnuptial" agreement. *Fraud. Divorce and Separation,* Separation agreement.

In a divorce proceeding, the judge did not err in refusing to enforce an agreement made by the parties while they were married and not antici- pating an immediate divorce, the alleged purpose of which was to pre- serve the marriage, where the evidence warranted the judge's findings that the agreement was not free from fraud because the wife, while outwardly pledging to persevere in the preservation of the marriage, was simply concerned with arranging a favorable financial settlement. [535-537]

COMPLAINT for divorce filed in the Plymouth Division of the Probate and Family Court Department on September 19, 1986.

The case was heard by *Sumner Z. Kaplan,* J.

The Supreme Judicial Court on its own initiative trans- ferred the case from the Appeals Court.

*Monroe L. Inker (Ann Wagner* with him) for Geraldine Fogg.

*Marshall F. Newman* for Stanley R. Fogg.

NOLAN, J. This court has recognized the validity of ante- nuptial agreements (*Osborne* v. *Osborne,* 384 Mass. 591 [1981]), and separation agreements (*Knox* v. *Remick,* 371 Mass. 433 [1976]). Today we are presented for the first time with a so called "postnuptial" agreement, one made while the parties are married and not in anticipation of an immedi- ate divorce. The alleged purpose of the agreement in question was to preserve the marriage. The husband claims the agree- ment is unenforceable because it is void as against public

policy and, even if valid, it is unenforceable because he signed as a result of the wife's fraud. The wife asserts that the agreement is valid and binding. The husband filed a complaint for divorce and the wife counterclaimed, seeking specific performance of the "postnuptial" agreement. The judge granted the husband's motion to dismiss the counterclaim under Mass. R. Dom. Rel. P. 12 (b) (1) and (6) (1990).[1] We affirm the judge's distribution of property and dismissal of the wife's counterclaim. Assuming, without deciding, that this type of agreement is valid, it must be free from fraud and coercion.[2] This contract, according to the findings of the judge, was the product of deception by the wife. Therefore, the agreement is invalid.

The facts that gave rise to this action were found by the judge to be as follows. In 1979, Geraldine Krevosky (wife) was living at 55 Juniper Lane in Pembroke with her two minor children. In 1979, the wife was employed by Fogg, Inc., a corporation owned exclusively by Stanley Fogg (husband). The business of the corporation is land acquisition and site development. Fogg had graduated from Northeastern University in 1959 with a degree in civil engineering. He had organized Fogg, Inc., in 1973. In June of 1979, the husband moved into the wife's house at 55 Juniper Lane. At the time he moved in, title to the home was in the name of the wife and her former husband. Fogg had also been divorced, and had two adult children by his first marriage.

---

[1] We note that the judge may have improvidently granted the husband's motion under Mass. R. Dom. Rel. P. 12 (b) (6), as a procedural matter. The wife was alleging a contract action. A claim was stated. Instead of granting the motion under rule 12 (b) (6), the more appropriate disposition would have been to allow the husband to plead an affirmative defense on the theory that the contract was unenforceable. However, even though he granted the motion, the judge heard testimony on the circumstances of the execution of the contract. He made sufficient findings for us to determine that he believed that the contract was the product of deception by the wife. Therefore, the dismissal under rule 12 (b) (6) was harmless error.

[2] We leave to another day whether agreements made after the parties have been married, and not in anticipation of an immediate divorce, are valid.

Beginning in 1978, Fogg, Inc., began acquiring properties in Pembroke collectively known as Edgewater at Pembroke. The parcel consisted of approximately 141 undeveloped individual house lots, parks, and roads. In June of 1980, the corporation conveyed to the husband forty-four of the lots, all of which were still undeveloped. This deed included "lot 44," the site of the parties' proposed future marital home. In the summer of 1983, the husband sold several of the lots to a third-party builder for $234,000. At that time, he discharged the mortgages under which the original bank financing was secured for purchase of the whole Edgewater tract.

In 1980, the husband acquired 260 acres of land in the same area as the original acquisition. The mortgages for the 1978 and 1980 purchases were subordinated in 1982 to a $425,000 borrowing by Fogg for development purposes. Fogg paid the 1982 note and mortgage and received a discharge in August, 1983, prior to the marriage. The judge found that, at the time of the marriage, the husband was free of debt to banks and to the owner of certain properties from the 1978 and 1980 purchases. At the time of the marriage, his combined liabilities for all of his parcels of land did not exceed $250,000. The judge determined that at the time of the marriage, the wife's financial worth, consisting chiefly of $33,000, a one-half interest in the Juniper Lane house, and a Corvette automobile, was substantially less than that of the husband.

The wife, as an employee of the corporation, was privy to almost all of the husband's land holdings, assets, and liabilites. In the summer of 1983, she still refused to marry him, although he had asked her many times. The judge found that later in the summer, "after [the husband's] indebtedness was negligible and his assets considerable," she asked him to marry her and presented him with a wedding band. The parties were married in December of 1983.

The parties continued to live together at Juniper Lane until January 2, 1986. While living at Juniper Lane, the husband gave his wife money with which to run the household and to make the mortgage payments. In addition, in May of

1985, he had paid his wife's first husband $35,000 for the transfer of his interest in the home to her. In January, 1986, the parties moved to their newly built home on lot 44, 257 Edgewater Drive. This was the husband's "dream house."

In 1984 and 1985, the husband continued his business of selling land, depositing the proceeds into his own account. In June, 1986, he purchased an office in Pembroke for corporate purposes. There was no contribution by the wife to the improvement or appreciation of any of the lots held by the husband.

Marital problems occurred as early as February of 1984, over the husband's daughter. Even though the parties were designing their "dream house" together, they were not getting along and, by the spring of 1985, the marriage had ended for all practical purposes.

By January, 1986, a divorce was contemplated by the parties. At that time, in an apparent attempt to relieve some of the marital friction, the parties executed a trust and an agreement. The validity of this agreement is at issue. In the agreement, the parties stated the belief that, if they were able to agree on disposition of certain assets, the domestic friction would be eliminated. The parties affirmed in the agreement that they were entering into it for the preservation of the marriage. In addition to setting forth a number of property rights which the husband would transfer to his wife, the agreement provided for property dispositions in the event of divorce or the death of one of the parties.

Pursuant to the agreement, the husband: (1) gave $215,000 in cash to the wife, (2) gave his fee simple interest in Edgewater lots 36 and 42 to her; (3) waived any interest in the Corvette automobile, the Juniper Lane house, or the house at 257 Edgewater Drive; (4) gave her a one-half interest in his Mercedes Benz automobile, and (5) agreed to create the Fogg family trust.

The husband gave the wife a check for $215,000 in January of 1986. He had previously given her a check for $100,000 in May of 1985. The judge found that, although she stated in the agreement that she was entering into it to

preserve the marriage, after the spring of 1985 "[the wife] was seeking an adequate and secure financial arrangement for herself and the husband was hoping that by providing such an arrangement that marriage would become viable." There was a change made in the agreement in March of 1986, as a result of further arguments between the parties. The judge stated that he considered the trust and the agreement only in connection with the conduct of the parties. The judge found that the husband had persisted in trying to preserve the marriage while the wife was solely concerned with arranging a satisfactory financial settlement.

At issue is the judge's refusal to enforce specifically the agreement. The judge refused to adhere to the agreement and made an equitable distribution of the marital assets under G. L. c. 208, § 34 (1988 ed.). The wife had filed a counterclaim seeking specific enforcement. The judge granted the husband's motion to dismiss under Mass. R. Dom. Rel. P. 12 (b) (6). While we decline to determine the validity of so-called "postnuptial" agreements, we rule that the judge did not commit error in refusing to enforce this agreement. Even if this type of agreement is valid, it must be free from fraud and coercion and meet the requirements set forth in *Knox* v. *Remick*, 371 Mass. 433, 436 (1976). The judge's findings indicate that the agreement here was not free from fraud because the wife, while outwardly pledging to persevere in the preservation of the marriage, was simply concerned with arranging a favorable financial settlement. The evidence fully warranted the judge's findings.

In *Knox* v. *Remick*, we recognized that parties may enter into a separation agreement which anticipates divorce, to resolve permanently their rights and obligations, including support obligations. *Id.* at 436. The judge shall first determine, however, that "the agreement was not the product of fraud or coercion, that it was fair and reasonable at the time of entry of the judgment nisi, and that the parties clearly agreed on the finality of the agreement." *Id.* In *Rosenberg* v. *Lipnick*, 377 Mass. 666, 673 (1979), we stated that antenuptial agreements, those executed in anticipation of marriage,

must be executed fairly, free from "fraud, imposition, deception, or over-reaching."

Although we decline to determine whether postnuptial agreements are valid, we note that, if valid, they would at least have to meet the same threshold requirements of antenuptial and separation agreements. The agreement before us was signed as a result of the wife's implied fraudulent promise that she would attempt to preserve the marriage. Thus, it is invalid.

The judge stated in his findings that "[a]n agreement regarding disposition of assets *as a condition of keeping the marriage together* was sought by [the wife]." The husband signed the agreement believing that, by doing so, his wife would not divorce him or, at least, that she would attempt to preserve the marriage. The judge found that the wife "was solely interested in financial security and financial gain." He stated that, in entering into the agreement, the wife "was seeking an adequate and secure financial arrangement for herself," while the husband was hoping that the agreement would make the marriage viable.

The wife's intentions at the time of signing were contrary to those set forth in the agreement that "the [parties] share the belief that, if they are able to agree upon an orderly disposition of these assets, the cause of any domestic friction and unhappiness will be eliminated, and their marriage will be preserved thereby." She induced her husband to sign the agreement by outwardly pledging her belief that, if the financial arrangements were made, she would then try to preserve the marriage. While promising to persevere, she was really only concerned with obtaining a favorable settlement of the marital assets.

The judge found that the wife's conduct during the marriage "in no way contributed to its preservation and in almost every way contributed to its deterioration." He stated that once the wife "felt she had [an adequate financial] arrangement . . . she told [the husband] she wanted a divorce." The husband signed the agreement as a result of the wife's

fraudulent and deceptive promise to attempt to maintain the marriage. Therefore, the agreement is unenforceable.

*Judgment affirmed.*