KENNETH S. ANSIN vs. CHERYL A. CRAVEN-ANSIN.

Worcester. April 5, 2010. - July 16, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Husband and Wife,* Marital agreement. *Contract,* Marital agreement. *Divorce and Separation,* Division of property.

This court concluded that a so-called postnuptial or marital agreement does not violate public policy and may be enforced [288-289], but must be scrutinized by a judge to determine whether each party had an opportunity to obtain separate legal counsel of that party's own choosing, whether there was fraud or coercion in obtaining the agreement, whether all assets were fully disclosed by both parties before the agreement was executed, whether each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce, and whether the terms of the agreement were fair and reasonable at the time of execution and remained so at the time of divorce [289-291].

In a divorce action, a judge in the Probate and Family Court properly entered judgment enforcing a marital agreement against the wife, where the agreement was not the product of fraud [291-293], the husband met the rigorous standard for disclosure of his assets [293-295], the wife's waiver in the agreement of her rights in the event of divorce was meaningful [295-296], and the terms of the agreement were fair and reasonable both at the time of execution [296-298] and at the time of divorce [298-299].

COMPLAINT for divorce filed in the Worcester Division of the Probate and Family Court Department on November 29, 2006.

The case was heard by *Lucille A. DiLeo,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Susan E. Stenger* (*Nancy R. Van Tine & Robin M. Lynch Nardone* with her) for the defendant.

*David H. Lee* (*Kevin M. Corr* with him) for the plaintiff.

MARSHALL, C.J. We granted direct appellate review in this divorce proceeding to determine whether so-called "postnuptial" or "marital" agreements are contrary to public policy and,

if not, whether the marital agreement at issue is enforceable.[1] The dispute is between Kenneth S. Ansin (husband) and Cheryl A. Craven-Ansin (wife) concerning the validity of their 2004 written agreement "settling all rights and obligations arising from their marital relationship" in the event of a divorce. Two years after the agreement was executed, in November, 2006, the husband filed a complaint for divorce and sought to enforce the terms of the agreement. At the time of the complaint, the parties had been married for twenty-one years and had two sons.

A judge in the Probate and Family Court upheld the agreement, finding that it was negotiated by independent counsel for each party, was not the product of fraud or duress, and was based on full financial disclosures by the husband, and that the terms of the agreement were fair and reasonable at the time of execution and at the time of divorce. Judgment entered enforcing the marital agreement. The wife appealed, and we granted both parties' applications for direct appellate review.[2] We now affirm.

1. *Facts.* We recite the facts as found by the judge, all of which are supported by the record.

a. *The marital assets.* At the time of the execution of the marital agreement in 2004, the value of the combined assets of the husband and wife was approximately $19 million. One of the assets, now at issue, is the husband's interest in certain trusts and business entities established by his grandfather, currently managed by his uncle. The assets of these various entities are substantial real estate holdings in Florida.[3] The husband's

---

[1]A "postnuptial" or "marital" agreement is an "agreement between spouses who plan to continue their marriage that alters or confirms the legal rights and obligations that would otherwise arise under . . . [the] law governing marital dissolution." American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 7.01(1)(b) (2002) (ALI Principles of Family Dissolution). See *Fogg* v. *Fogg*, 409 Mass. 531, 531-532 (1991) (same). Consistent with the ALI, we adopt the term "premarital" agreement for what is often termed a prenuptial or antenuptial agreement, and the term "marital" agreement for what is often termed a postnuptial agreement. See ALI Principles of Family Dissolution, *supra* at § 7.01(1)(a), (b).

[2]In September, 2008, the proceedings having been bifurcated, a judgment of divorce nisi was entered on the grounds that the parties' marriage was irretrievably broken down. The judgment became absolute in December, 2008. The wife neither sought to stay, nor appealed from, that judgment.

[3]We shall refer to the husband's interests in the trusts and business entities owned by his family as the husband's interest in Florida real estate.

interest in the Florida real estate is passive; he was not involved in the management of the properties, and did not have or exercise control over the sale or other disposition of the properties. During the course of the marriage, the husband received, and the wife was aware of, distributions from his interest in the Florida real estate. The timing and amount of the distributions was unpredictable, and varied widely, as the wife knew.

During the course of their marriage the couple retained RINET Company LLC (RINET) to provide financial advice to them and to prepare their joint tax returns. The parties' primary financial planner from RINET met with the couple on a quarterly basis, and RINET prepared "periodic summary reports" to permit the couple to monitor their financial affairs. Because the husband's interest in the Florida real estate was "fractional" and "noncontrolling," and because "speculation" is "inherent in any attempt to assign any values to such interests," there was no attempt by RINET to assign concrete values to these assets. Rather, on the reports prepared by RINET, the husband's interest in the Florida real estate was given a "placeholder" value of $4 million to $5 million (the amount varied from time to time), of which the wife was well aware. The wife understood that the husband's principal objective in executing a marital agreement was to protect his interest in the Florida real estate in the event of a divorce.

b. *The marital agreement.* The parties were married in July, 1985. The execution of their marital agreement nineteen years later was precipitated by marital problems that began toward the end of 2003. At the time the couple sought the assistance of a marriage counsellor. In early 2004, the husband informed his wife that he "needed" her to sign an agreement if their marriage was to continue. He testified that his "uncertainty" about the wife's commitment to their relationship was the reason for this request. It caused the wife a "great deal of stress"; she told her husband that she would not sign any such agreement, and that discussion of the issue made her "physically ill." The parties separated, as it turned out for some six weeks. While the parties were separated, the husband promised his wife that he would recommit to the marriage if she would sign a marital agreement. She agreed to do so, she said, in an attempt to preserve the marriage and the family. The parties resumed living together, and went on a "second honeymoon."

In April, 2004, they began negotiating the terms of the agreement, which we describe below. Each retained counsel. The judge's detailed description of the negotiations depicts back-and-forth discussions between counsel for the wife and counsel for the husband, during which the wife negotiated terms more favorable to her. Several draft agreements were exchanged. The judge found that in the course of the negotiations the wife was "fully informed" of the marital assets, and that she was "satisfied" with the disclosures made by the husband with respect to the Florida real estate, which included the financial summaries prepared by RINET that used the "placeholder" values. Finally, with the assistance of their respective counsel, the parties reached an agreement; it was signed in July, 2004.

We briefly summarize key provisions of the marital agreement. The agreement sets forth the parties' intent that, in the event of a divorce, the terms of the agreement are to be "valid and enforceable" against them, and "limit the rights" that "otherwise arise by reason of their marriage."[4] The agreement recites that the parties are aware of the rights to which they may be entitled under Massachusetts law, that each has retained independent legal counsel, and that each executed the agreement "freely and voluntarily." The agreement states that the parties are "aware of the other's income," warrants that each has been provided with "all information requested by the other," and affirms that each "waives his or her rights to further inquiry, discovery and investigation." The agreement further recites that each is "fully satisfied" that the agreement "will promote marital harmony" and "will ensure the treatment of Husband's property to which the parties agreed before their marriage and since their separation."

As for the distribution of property in the event of a divorce, the agreement states that the wife "disclaims any and all interest she now has or ever may have" in the husband's interest in the Florida real estate and other marital assets. The husband agreed to pay the wife $5 million, and thirty per cent of the

---

[4]More specifically, the agreement states that the parties "desire by this Agreement to fix and limit the rights of each of them in and to any property that the other has any right, title or interest, or in the future, may obtain any right, title or interest in the event of dissolution of the parties' marriage, in lieu of and in full discharge and satisfaction of the rights which otherwise arise by reason of their marriage."

appreciation of all marital property held by the couple from the time of the agreement to the time of the divorce.[5] The agreement provides that the wife could remain in the marital home for one year after any divorce, with the husband paying all reasonable expenses of that household. The husband agreed to pay for the wife's medical insurance until her death or remarriage, and he agreed to maintain a life insurance policy to the exclusive benefit of the wife in the amount of $2.5 million while the parties remained married.

c. *Events following execution of marital agreement.* On execution of the marital agreement, the relationship between the husband and wife took on, in the judge's words, a "light and optimistic tone" and both were "looking forward to strengthening their marriage." The two engaged in numerous activities together, including training for a marathon and traveling. However, in August, 2004, the parties had a discussion that "led the [w]ife to believe that their marriage was over." The husband had not decided to divorce his wife, and the judge credited his testimony that he was "unwilling" to abandon the marriage at that time.

In response to their marital difficulties, the parties again considered separating, but decided not to do so at least until their younger son graduated from high school. They remained living together from August, 2004, until June, 2005, engaged in an intimate relationship, and "attempted to preserve the appearance of their marriage." During this time, they purchased a new home for $790,000, and paid $500,000 for its renovations.

Meanwhile, the husband applied for and was accepted to Harvard University's Kennedy School of Government; his decision to enroll as a student there was not supported by his wife. The wife began to increase her consumption of alcohol, leading to more arguments with her husband. In June, 2005, at the wife's request, the husband moved out of the house. He did not file for divorce at that time, believing that while things looked "grim," filing for divorce would have been the "ultimate declaration" that his marriage was over. After separating from her husband, the wife maintained contact with their RINET financial

[5]The agreement defined marital property with specificity and provided a mechanism for determining the wife's thirty per cent interest.

advisor, inquiring on multiple occasions what the value of any payment to her would be under the terms of the marital agreement. In 2006 the wife became involved in a serious relationship with another man. In February of that year, the wife informed the husband that "one of us has to be strong enough to take the steps to bring closure to our relationship." She did not commence divorce proceedings. In November, 2006, the husband filed a petition for divorce.

2. *Validity of marital agreement.* Whether a marital agreement should be recognized in Massachusetts is a long-deferred question of first impression. See *Fogg* v. *Fogg*, 409 Mass. 531, 532 n.2 (1991).[6] Consistent with the majority of States to address the issue, see *Bratton* v. *Bratton*, 136 S.W.3d 595, 599-600 (Tenn. 2004), we conclude that such agreements may be enforced. See e.g., *Matter of Estate of Harber*, 104 Ariz. 79, 86 (1969); *Casto* v. *Casto*, 508 So. 2d 330, 333 (Fla. 1987); *Lipic* v. *Lipic*, 103 S.W.3d 144, 149 (Mo. Ct. App. 2003); *Matter of Estate of Gab*, 364 N.W.2d 924, 925 (S.D. 1985).[7] Our decision is consistent with our established recognition that a marital relationship need not vitiate contractual rights between the parties. We have, for example, recognized the validity of premarital agreements, *Osborne* v. *Osborne*, 384 Mass. 591, 598 (1981), and separation agreements, *Knox* v. *Remick*, 371 Mass. 433, 436 (1976), reasoning that it was important to respect the parties' "freedom to contract" and that such agreements may serve a "useful function" in permitting the parties to arrange their financial

---

[6]In *Fogg* v. *Fogg*, 409 Mass. 531 (1991), this court left "to another day" the question whether marital agreements were valid, *id.* at 532 n.2, noting that even if "this type of agreement is valid, it must be free from fraud and coercion," *id.* at 532, and affirming the judge's finding that the agreement in that case was fraudulently induced, *id.* at 535. See *Rubin* v. *Rubin*, 29 Mass. App. Ct. 689, 697 (1991) (marital agreement invalid because it was product of coercion).

[7]Several States have enacted statutes that permit the enforcement of marital agreements. See, e.g., *Tibbs* v. *Anderson*, 580 So. 2d 1337, 1339 (Ala. 1991); *Boudreaux* v. *Boudreaux*, 745 So. 2d 61, 63 (La. Ct. App. 1999); *Button* v. *Button*, 131 Wis. 2d 84, 87-88 (1986). But see Ohio Rev. Code Ann. § 3103.06 (West 2005) ("A husband and wife cannot, by any contract with each other, alter their legal relations, except that they may agree to an immediate separation and make provisions for the support of either of them and their children during the separation"). Many States have not addressed the issue. We are aware of no jurisdiction that has declined to enforce such agreements unless required to do so by statute.

affairs "as they best see fit." *DeMatteo* v. *DeMatteo,* 436 Mass. 18, 30 (2002) (concerning premarital agreements). See *Osborne* v. *Osborne, supra* ("no reason not to allow persons about to enter into a marriage the freedom to settle their rights in the event their marriage should prove unsuccessful"); *Knox* v. *Remick, supra* ("no reason why parties to a separation agreement which anticipates that the marriage will be terminated by divorce may not agree to a permanent resolution of their mutual rights and obligations, including support obligations between them," provided that judge rules agreement is "not the product of fraud or coercion," that it is "fair and reasonable," and that parties agreed to its "finality").

The wife argues that marital agreements are different in kind and should be declared void against public policy because they are "innately coercive," "usually" arise when the marriage is already failing, and may "encourage" divorce. The wife provides no support for, and we reject, any assumption that marital agreements are typically executed amid threats of divorce or induced by illusory promises of remaining in a failing marriage. Marital contracts are not the product of classic arm's-length bargaining, but that does not make them necessarily coercive. Such contracts may inhibit the dissolution of a marriage, or may protect the interests of third parties such as children from a prior relationship. In any event, a marital agreement will always be reviewed by a judge to ensure that coercion or fraud played no part in its execution.

3. *Judicial review of a marital agreement.* A marital agreement stands on a different footing from both a premarital and a separation agreement.[8] Before marriage, the parties have greater freedom to reject an unsatisfactory premarital contract. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 50:15 (3d ed. 2002) (hereinafter Kindregan & Inker) (agreement made in expectation of marriage "radically" different situation from

---

[8]The ALI takes the position that "the principles applicable to marital and premarital agreements are the same" and suggests, as some States have done, applying substantially the same standards for enforcing both types of agreements. ALI Principles of Family Dissolution, *supra* at § 7.01 Reporter's Notes to comment e, citing *Reese* v. *Reese,* 984 P.2d 987 (Utah 1999). While we draw on some aspects of the ALI's suggestions on how to evaluate marital agreements, we conclude that the principles applicable to premarital and marital agreements are not the same in all respects.

"that which faces a spouse attempting to save a long existing family relationship to which she has committed her best years"); *Pacelli* v. *Pacelli*, 319 N.J. Super. 185, 190 (App. Div. 1999) (wife faced more difficult choice "than the bride who is presented with a demand for a pre-nuptial agreement" because cost "would have been the destruction of a family and the stigma of a failed marriage"). See also American Law Institute, Principles of Family Dissolution: Analysis and Recommendations § 7.01 comment e (2002) (ALI Principles of Family Dissolution) ("opportunities for hard dealing may be greater" with marital contracts than with premarital contracts).

A separation agreement, in turn, is negotiated when a marriage has failed and the spouses "intend a permanent separation or marital dissolution." *Id.* at § 7.01(1)(c). See *Knox* v. *Remick*, *supra* at 436 (separation agreement is "a permanent resolution of [a married couple's] mutual rights and obligations, including support obligations between them"). The family unit will no longer be kept intact, and the parties may look to their own future economic interests. See Kindregan & Inker, *supra* (separation agreements, unlike marital agreements, are not executed "when the parties are still hopeful of saving a troubled marriage"). The circumstances surrounding marital agreements in contrast are "pregnant with the opportunity for one party to use the threat of dissolution 'to bargain themselves into positions of advantage.' " *Pacelli* v. *Pacelli*, *supra* at 195, quoting *Mathie* v. *Mathie*, 12 Utah 2d 116, 121 (1961).

For these reasons, we join many other States in concluding that marital agreements must be carefully scrutinized. See, e.g., *Casto* v. *Casto*, 508 So. 2d 330, 334 (Fla. 1987) (court "must recognize that parties to a marriage are not dealing at arm's length, and, consequently, trial judges must carefully examine the circumstances to determine the validity of [marital] agreements"); *Matter of Estate of Gab*, 364 N.W.2d 924, 925-926 (S.D. 1985), citing *Matter of Estate of Harber*, 104 Ariz. 79 (1969) (because of "confidential relationship" existing between husband and wife, marital agreements "are subjected to close scrutiny by the courts to insure that they are fair and equitable"); *Bratton* v. *Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004) (same). See also ALI Principles of Family Dissolution, *supra* at § 7.01 Reporter's Notes to comment e ("the problems presented

by the two kinds of agreements [premarital and marital] are different, which has led some states to adopt different rules" for each).

Before a marital agreement is sanctioned by a court, careful scrutiny by the judge should determine at a minimum whether (1) each party has had an opportunity to obtain separate legal counsel of each party's own choosing[9]; (2) there was fraud or coercion in obtaining the agreement; (3) all assets were fully disclosed by both parties before the agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; and (5) the terms of the agreement are fair and reasonable at the time of execution and at the time of divorce.[10] Where one spouse challenges the enforceability of the agreement, the spouse seeking to enforce the agreement shall bear the burden of satisfying these criteria. See ALI Principles of Family Dissolution, *supra* at § 7.04(2) ("A party seeking to enforce an agreement must show that the other party's consent to it was informed and not obtained under duress").

We now elaborate on those points as they apply to the marital agreement here.

a. *Fraud and coercion.* As with contracts generally, marital

---

[9]We do not require, as do some other States, that a marital agreement will be enforceable only if each spouse is represented by separate counsel. See, e.g., Minn. Stat. Ann. § 519.11(1a)(c) (West 2006) ("A postnuptial contract or settlement is valid and enforceable only if at the time of its execution each spouse is represented by separate legal counsel"). Reliance on the advice of experienced, independent legal counsel, however, will go a long way toward ensuring the enforceability of an agreement. Cf. ALI Principles of Family Dissolution, *supra* at § 7.04 (marital agreement "rebuttably presumed" to satisfy showing that contesting party's consent was "informed and not obtained under duress" if parties were "advised to obtain independent legal counsel, and had reasonable opportunity to do so before the agreement's execution"). Here it is undisputed that both parties to this agreement not only had the opportunity to, but did, obtain separate legal counsel.

[10]The wife argues that she did not receive "sufficient" consideration because the financial components of the agreements were "far less" than she was "already entitled to receive" on divorce. In this case, and likely would be in any case, this is in essence an argument that the marital agreement was not fair and reasonable. See part 3.d, *infra.* Because the marital agreement was supported by consideration, we need not consider whether a marital agreement needs to be supported by consideration. See ALI Principles of Dissolution, *supra* at § 7.01(4) (consideration not required to create enforceable marital agreement).

agreements are not enforceable if tainted by fraud or coercion. *Fogg* v. *Fogg*, 409 Mass. 531, 535 (1991). We agree with those States that have held that the spouse seeking to enforce a marital agreement, in contrast to the enforcement of contracts generally, must establish that the other spouse's consent was not obtained through coercion or fraud. See, e.g., *Matter of Estate of Harber*, *supra* at 88 (where marital agreement challenged on grounds of fraud or coercion, it is other party's "burden to prove by clear and convincing evidence that the agreement was not fraudulent or coerced").[11] See also ALI Principles of Family Dissolution, *supra* at § 7.04 comment b (burden shifting reflects appropriate "heightened scrutiny" of bargaining process leading to marital agreements as compared with bargaining process leading to commercial contracts). Cf. *Matter of Estate of Gab*, *supra* at 926, quoting *Keith* v. *Keith*, 37 S.D. 132, 133 (1916) ("less evidence is required in such cases to establish the fraud, oppression, or deception than if the parties had been dealing at arm's length as strangers").

Even though the judge in this case did not utilize a burden-shifting analysis, we see no reason to question her ultimate finding that the marital agreement was not the product of coercion or fraud. The agreement was the product of lengthy negotiations between the parties, each represented by separate, experienced counsel. The wife's attorney testified that, consistent with the instructions of her client, she intended to negotiate an enforceable marital agreement. A vigorous exchange ensued with the husband's counsel in which she was able to negotiate significant gains for the wife.[12] The evidence is clear that the wife made an informed, voluntary choice to sign the agreement.[13]

As to fraud, the wife argues that the husband misrepresented

[11]We do not agree with the Arizona court, see *Matter of Estate of Harber*, 104 Ariz. 79, 88 (1969), that the burden must be satisfied by "clear and convincing" evidence. See ALI Principles of Family Dissolution, *supra* at § 7.04 comment b (shift burden of proof to spouse seeking to enforce agreement, but not suggesting proof by clear and convincing evidence).

[12]We need not recite the factual findings of the judge that identify with specificity the negotiations and the gains secured by the wife.

[13]The wife suggests that because the parties' younger son suffers from an illness, she was pressured into signing the agreement to preserve her son's "happiness and stability." The judge made no findings concerning the son's illness or its effect on the wife's decision to sign the marital agreement. The

his intention to stay in the marriage in order to induce her to sign the agreement. The judge found to the contrary, and her findings are fully supported by the evidence. For example, after the agreement had been signed, the husband worked "hard" in the areas the wife "felt needed improvement." The couple traveled together extensively. They purchased and substantially renovated a new house together. It was not until over two years later, after the wife had asked the husband to leave the marital home and after she had become involved with another man, that the husband filed for divorce.[14] A judge should be careful to ensure that the contesting spouse has not been misled in any way by a spouse that at the time seems committed. We are confident that the judge did so in this case.

b. *Disclosure of assets.* We have explained with respect to premarital agreements that "[f]ull and fair" disclosure of each party's financial circumstances is a "significant aspect" of the parties' obligation to deal with each other fairly "because they stand in a confidential relationship with each other" and must have such information in order to make an informed decision about the terms of the agreement. *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 27 (2002). The obligation is greater with respect to

wife made no request for additional findings on those points, and we do not consider them. It may be that in some circumstances evidence that a spouse agrees to a marital agreement because of concern for the illness of a child and evidence that the child will be harmed by a divorce will be sufficient to establish coercion or duress.

[14]The wife testified at trial that in or around August, 2004, several weeks after the agreement was signed, the parties had a discussion that led the wife to believe that their marriage was over, and the parties then sought the advice of their marriage counsellor, as well as their son's physician, to consider a separation that would be the least disruptive for him. The wife argues that the judge erred in not allowing her to testify concerning the contents of this conversation, which she claims would have shown that the husband did not intend to stay in the marriage when he asked her to sign the agreement. The judge excluded her testimony on the grounds of "spousal disqualification." That evidentiary rule provides that "a witness shall not testify as to private conversations with a spouse occurring during their marriage," see Mass. G. Evid. § 504(b) (2010), but recognizes an exception for proceedings "arising out of or involving a contract between spouses," *id.* at § 504(b)(2)(A). We question whether the evidence should have been excluded, given the exception to the spousal disqualification rule. Even if the ruling was erroneous, however, it was harmless. There was ample other evidence to support the judge's finding that the husband did not fraudulently induce the wife to sign the agreement.

marital agreements because each spouse owes a duty of absolute fidelity to the other. See *Krapf* v. *Krapf,* 439 Mass. 97, 103 (2003) (spouses "stand as fiduciaries to each other, and will be held to the highest standards of good faith and fair dealing in the performance of their contractual obligations"). Because a marital agreement is consummated without the safeguards attendant to divorce proceedings, such as court-ordered disclosures, see Rule 401 (a) of the Supplemental Rules of the Probate Court, Mass. Ann. Laws Court Rules, at 1133 (LexisNexis 2008-2009), and discovery, enforcement of a marital agreement can occur only when a judge finds that there was a full disclosure of all assets of both spouses, whether jointly or separately held. The requirement of full disclosure may be satisfied if "prior to signing the agreement the party seeking to enforce it provided the other party with a written statement accurately listing (i) his or her significant assets, and their total approximate market value; (ii) his or her approximate annual income . . . and (iii) any significant future acquisitions, or changes in income, to which the party has a current legal entitlement, or which the party reasonably expects to realize" in the near future. ALI Principles of Family Dissolution, *supra* at § 7.04(5).[15] The disclosure need not be exact, but must approximate the value of the assets.

We agree with the judge that the disclosures here were sufficient to meet this rigorous standard. The wife argues that the husband undervalued his interest in the Florida real estate, and that he committed a breach of the warranty in the agreement that such disclosures were "accurate and truthful." The facts as found by the judge belie this claim.[16] During the marriage the wife was aware of her husband's interest in a "significant

[15]The ALI Principles of Family Dissolution, *supra* at § 7.04(5), specifies that the spouse seeking to enforce the agreement must have disclosed his income for "each of the preceding three years" and any significant future acquisitions or changes in income that the party "reasonably expects to realize within three years of the agreement's execution." We need not determine whether a three-year period is appropriate in this case because the wife was aware of the couple's marital assets and income, and participated regularly in meetings with the couple's financial advisor throughout the marriage. See ALI Principles of Family Dissolution, *supra* at § 7.04(5) comment g (evidence that contesting spouse has knowledge of all other spouse's assets independent of any written disclosures will satisfy requirement of disclosure).

[16]The judge held a separate hearing to receive evidence as to the husband's

amount" of real estate in Florida, that the precise value of that interest was uncertain and speculative, that there was limited information available concerning the real estate, and that the $4 million to $5 million value assigned to those interests by RINET was a "placeholder."[17] During the negotiation of the agreement, the wife provided her attorney with a December 31, 2003, summary of the parties' net worth prepared by RINET, and the husband provided a similar June 30, 2004, report. Each summary contained the "placeholder" value, stating that the Florida properties had an "[a]nticipated" value of $5 million. While she was negotiating the marital agreement, the wife had access to the couple's financial advisor, with whom she previously had regularly met, and her own independent counsel to assist her in making any inquiries about the "placeholder" value that she felt was required. The judge found that the wife was "satisfied" with the disclosures, accepting that the available information about the properties was necessarily limited. Information about the Florida real estate was not, in the judge's words, "a strong point of contention between the parties."

The wife acknowledged when she executed the marital agreement that she had "been provided with all information requested," that she was "afforded sufficient opportunity to inquire and investigate further financial circumstances" of her husband, and that she waived her "rights to further inquiry." There is nothing in the record to suggest that those representations were inaccurate.[18]

c. *Waiver.* By the terms of their agreement, the husband and

and the wife's finances, in connection with which each spouse was required to submit financial statements, and each was able to cross-examine the other as to the information in these statements. The judge found that the husband's financial statement was a "true, accurate and complete" representation of his financial affairs. In contrast, the judge found that the wife's statements were not an "accurate" picture of her financial affairs because, among other things, she failed to list interest income on over $1 million in brokerage account investments.

[17]In connection with the divorce, the husband contacted his uncle who manages the Florida properties to obtain a rough estimate of their value. The judge credited the husband's testimony that this was the "best method to obtain a value" for the husband's interest in the Florida real estate.

[18]In light of these representations, and where the evidence shows that the wife had full knowledge of the limitations on the information concerning the value of the Florida real estate, the judge did not err in denying the wife further discovery in February, 2008, on the value of the Florida properties and

wife agreed that they intended the marital agreement to limit their rights in the event of divorce, and that the agreement should govern "in lieu of and in full discharge and satisfaction of the rights which otherwise arise by reason of their marriage." As we explained in the context of premarital agreements, waiver is "important because it underscores that each party is exercising a meaningful choice when he or she agrees to give up certain rights." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 29 (2002). In determining whether there was a meaningful waiver of rights, a judge should consider "whether each party was represented by independent counsel, the adequacy of the time to review the agreement, the parties' understanding of the terms of the agreement and their effect, and a party's understanding of his or her rights in the absence of an agreement." *Id.* Here, the wife was represented by independent counsel, who represented her over the course of several weeks as the terms of the agreement were negotiated. The wife affirmed in writing that she understood the rights she was waiving, and she does not claim that she did not understand any terms of the agreement. The evidence supports the conclusion that the wife's waiver was meaningful.

d. *Fair and reasonable terms.* We turn finally to the requirement that a marital agreement contain terms that are "fair and reasonable" at the time of execution and at the time of divorce. We do not accept the husband's suggestion that the standard applicable to marital agreements should be the same as the one applicable to premarital agreements. See note 8, *supra.*[19] As the wife points out, a marital agreement more closely resembles a separation agreement. The statutory rights and obligations con-

---

excluding the testimony of the wife's expert as to his opinion of the value of the Florida real estate. It appears from the transcript that the tax assessor was an expert in valuing land, and not in valuing marginal, noncontrolling interests in entities that own land.

[19]We adopted a more deferential standard of review for premarital agreements in part because when "terms of a proposed antenuptial agreement are unsatisfactory, a party is free not to marry." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 33 (2002). One party, perhaps having significant family wealth, may decline to enter the marriage unless he or she can protect these assets in the event of a divorce. Consequently, a premarital agreement may provide that on divorce there will be great inequality accorded to each party. For a *spouse* to relinquish statutorily proscribed marital rights to significant assets necessarily requires a more searching inquiry as to whether an agreement is "fair and reasonable."

ferred by marriage are not potential benefits for a divorcing spouse but an integral aspect of the marriage itself. The Legislature has required that the relinquishment of marital rights be assessed in light of the factors set forth in G. L. c. 208, § 34. In *DeMatteo* v. *DeMatteo, supra* at 33, we noted that "it is entirely appropriate" that the judge consider the factors set forth in G. L. c. 208, § 34, in evaluating a separation agreement; the "separation agreement is, after all, a substitute for the independent application by a judge" of the equitable division of parties' property as mandated by the Legislature. Similar considerations inform our view of the enforceability of marital agreements, with this additional observation: parties to a marital agreement do not bargain as freely as separating spouses may do. See part 3, *supra.* Because a marital agreement is executed when the parties do not contemplate divorce and when they owe absolute fidelity to each other, the heightened scrutiny to which we made reference earlier applies in this context as well.

In evaluating whether a marital agreement is fair and reasonable at the time of execution, a judge should accordingly consider the entire context in which the agreement was reached, allowing greater latitude for agreements reached where each party is represented by separate counsel of their own choosing. See note 9, *supra.* A judge may consider "the magnitude of the disparity between the outcome under the agreement and the outcome under otherwise prevailing legal principles," whether "the purpose of the agreement was to benefit or protect the interests of third parties (such as the children from a prior relationship)," and "the impact of the agreement's enforcement upon the children of the parties." ALI Principles of Family Dissolution, *supra* at § 7.05(3)(a), (c), (d). Other factors may include the length of the marriage, the motives of the contracting spouses, their respective bargaining positions, the circumstances giving rise to the marital agreement, the degree of the pressure, if any, experienced by the contesting spouse, and other circumstances the judge finds relevant.

Viewed at the time of execution, we agree with the judge that the marital agreement at issue here was fair and reasonable. As noted earlier, the wife was represented by experienced, independent counsel throughout the negotiations. In the event of

a divorce, the wife was to receive a substantial fixed sum payment from her husband. If the marital estate appreciated in value after execution of the agreement, she would receive, in addition, a percentage of the increase in value; she did not forgo the fixed payment if the marital assets, including the husband's interest in the Florida real estate, declined substantially. There is no basis to the wife's claim that the judge "ignore[d]" the husband's "legal obligation of disclosure of value" of the Florida real estate. As we discussed in detail earlier, the basis of the valuation was known to and accepted by the wife and her lawyer. We see no reason to disturb the judge's ruling on this point.

In determining whether a marital agreement is fair and reasonable at the time of divorce, a judge will be able to satisfy the searching inquiry we require by examining the same factors employed for evaluating a separation agreement. See *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 92 (1984). See also *Barry* v. *Barry*, 409 Mass. 727, 730 (1991) (judge considering separation agreement pursuant to divorce under G. L. c. 208, § 1A, or G. L. c. 208, § 1B, "should make a ruling at the time of the divorce that the agreement is fair and reasonable"). Thus, a judge may consider, among other factors, "(1) the nature and substance of the objecting party's complaint; (2) the financial and property division provisions of the agreement as a whole; (3) the context in which the negotiations took place; (4) the complexity of the issues involved; (5) the background and knowledge of the parties; (6) the experience and ability of counsel; (7) the need for and availability of experts to assist the parties and counsel; and (8) the mandatory and, if the judge deems it appropriate, the discretionary factors set forth in G. L. c. 208, § 34"[20] (footnotes omitted). *Dominick* v. *Dominick, supra.* As with a judge's evalu-

---

[20]In relevant part, G. L. c. 208, § 34, provides that a judge "shall consider the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. . . . [T]he court shall also consider the present and future needs of the dependent children of the marriage. The court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."

ation of separation agreements, the § 34 factors are not determinative; the judge is not required to "divine" what judgment she would likely enter had the case been litigated in the absence of an agreement. *Id.*[21] Rather, she considers only whether the agreement is "fair and reasonable" when considered in light of the factors we have identified and any other relevant circumstances. *Id.*

The gravamen of the wife's complaint is that she will be left with a disproportionately small percentage of the couple's marital assets. A marital agreement need not provide for an equal distribution of assets, as long as a judge has concluded that the agreement is fair and reasonable. In her careful and detailed findings, the judge considered the factors set forth in G. L. c. 208, § 34, as well as many of the other factors we have just detailed. The wife points to no material change between the time she, on the advice of counsel, executed the marital agreement and the husband's petition for divorce in 2006. We again see no reason to conclude that the judge was erroneous in her conclusion.

4. *Conclusion.* Enforcement of a marital agreement is not contrary to public policy. We agree with the judge in the Probate and Family Court that the marital agreement in this case should be specifically enforced.

*Judgment affirmed.*

---

[21]In evaluating the agreement, the judge is not required to hold an evidentiary hearing, although she may do so in her discretion, as the judge did in this case. See *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 92 (1984).