## DEBORAH BEDRICK *v.* BRUCE L. BEDRICK
### (SC 18568)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Eveleigh, Js.

Argued December 2, 2010—officially released April 26, 2011

*Campbell D. Barrett*, with whom were *Jon T. Kukucka*, and, on the brief, *C. Michael Budlong* and *Felicia Hunt*, for the appellant (defendant).

*Barbara J. Ruhe*, with whom, on the brief, was *Jonathan W. A. Ruhe*, for the appellee (plaintiff).

*Kenneth J. McDonnell*, for the minor child.

*Opinion*

McLACHLAN, J. This appeal involves a dissolution of marriage action in which the defendant, Bruce L. Bedrick, seeks to enforce a postnuptial agreement.[1] Today we are presented for the first time with the issue of whether a postnuptial agreement is valid and enforceable in Connecticut.

The defendant appeals from the trial court's judgment in favor of the plaintiff, Deborah Bedrick. The defendant claims that the trial court improperly relied upon principles of fairness and equity in concluding that the postnuptial agreement was unenforceable and, instead, should have applied only ordinary principles of contract law. We conclude that postnuptial agreements are valid and enforceable and generally must comply with contract principles. We also conclude, however, that the terms of such agreements must be both fair and equitable at the time of execution and not unconscionable at the time of dissolution. Because the terms of the present agreement were unconscionable at the time of dissolution, we affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. In August, 2007, the plaintiff initiated this action, seeking dissolution of the parties' marriage, permanent alimony, an equitable distribution of the parties' real and personal property and other relief. The defendant filed a cross complaint, seeking to enforce a postnuptial agreement that the parties exe-

[1] A postnuptial agreement is distinguishable from both a prenuptial agreement and a separation agreement. Like a prenuptial agreement, a postnuptial agreement may determine, inter alia, each spouse's legal rights and obligations upon dissolution of the marriage. As the name suggests, however, a postnuptial agreement is entered into during marriage—after a couple weds, but before they separate, when the spouses "plan to continue their marriage"; A.L.I., Principles of the Law of Family Dissolution: Analysis and Recommendations (2002) § 7.01 (1) (b), p. 1052; and when "separation or divorce is not imminent." Black's Law Dictionary (9th Ed. 2009).

cuted on December 10, 1977, and modified by way of handwritten addenda on five subsequent occasions, most recently on May 18, 1989.

The agreement provides that in the event of dissolution, neither party will pay alimony. Instead, the plaintiff will receive a cash settlement in an amount to be "reviewed from time to time." The May 18, 1989 addendum to the agreement provides for a cash settlement of $75,000. The agreement further provides that the plaintiff will waive her interests in the defendant's car wash business, and that the plaintiff will not be held liable for the defendant's personal and business loans.

In its memorandum of decision, the trial court stated that, although "[t]here is scant case law addressing the enforcement of postnuptial agreements in Connecticut . . . it is clear that a court may not enforce a postnuptial agreement if it is not fair and equitable. . . . [C]ourts have refused to enforce postnuptial agreements for lack of consideration, failure to disclose financial information, or an improper purpose." Concluding that the agreement was not fair and equitable, the trial court declined to enforce it. The court found that the value of the parties' combined assets was approximately $927,123, and ordered, inter alia, the defendant to pay lump sum alimony in the amount of $392,372 to the plaintiff. The defendant filed a motion to reargue claiming that the court should have applied principles of contract law in determining the enforceability of the agreement.

Following reargument, the trial court issued a second written decision, again declining to enforce the postnuptial agreement, and noting that the Connecticut appellate courts have not yet addressed the issue of the validity of such agreements. The court further declined to apply Connecticut's law governing prenuptial agreements, reasoning that, unlike a prenuptial

agreement, a postnuptial agreement is "inherently coercive" because one spouse typically enters into it in order to preserve the marriage, while the other is primarily motivated by financial concerns.

The trial court additionally determined that, even if postnuptial agreements were valid and enforceable under Connecticut law, the present agreement did not comply with ordinary contract principles because it lacked adequate consideration. The court explained that, because past consideration cannot support the imposition of a new obligation, continuation of the marriage itself cannot constitute sufficient consideration to support a postnuptial agreement. Moreover, the trial court emphasized that the plaintiff did not knowingly waive her marital rights because she neither received a sworn financial affidavit from the defendant nor retained independent legal counsel to review the agreement.

The trial court also opined that enforcement of the agreement would have been unjust and was "not . . . a fair and equitable distribution of the parties' assets" because the financial circumstances of the parties had changed dramatically since the agreement was last modified in 1989. Since 1989, the parties had had a child together and the defendant's car wash business had both prospered and deteriorated. This appeal followed.[2]

I

The defendant contends that the trial court improperly applied equitable principles in determining whether the postnuptial agreement was enforceable and, instead, should have applied only principles of contract

_____

[2] The defendant appealed from the judgment of the trial court to the Appellate Court and we granted his subsequent motion to transfer the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

law.[3] Specifically, the defendant cites *Crews* v. *Crews*, 295 Conn. 153, 167, 989 A.2d 1060 (2010), in which we stated that "equitable considerations codified in our statutes . . . have no bearing on whether [a prenuptial] agreement should be enforced. . . . In other words, whether . . . [a] court . . . thinks the agreement was a good bargain for the plaintiff does not enter into the analysis of the issue." (Internal quotation marks omitted.) The defendant claims that *Crews* precludes the consideration of factors beyond those of pure contract law in determining whether an agreement is enforceable. Although we agree with the defendant that principles of contract law generally apply in determining the enforceability of a postnuptial

[3] The defendant also argues that the trial court improperly considered issues that the plaintiff did not specifically plead. The defendant cites *McKenna* v. *Delente*, 123 Conn. App. 146, 156–59, 2 A.3d 38 (2010), to support the proposition that the proper way to attack the validity of a postnuptial agreement is by filing a special defense. We disagree, however, with the Appellate Court's decision in *McKenna*. The Appellate Court improperly relied on Practice Book § 10-50, which applies to pleadings in civil cases, to hold that the defense of unconscionability to enforcement of a prenuptial agreement must be pleaded specially. Id., 159. In fact, Practice Book § 25-9 is applicable to family relations cases, and does not require that any defenses be pleaded specifically. To the extent that *Friezo* v. *Friezo*, 281 Conn. 166, 197, 914 A.2d 533 (2007), suggests to the contrary, we disavow any such suggestion.

Additionally, the defendant's argument fails because the prenuptial agreement in *McKenna* was reviewed pursuant to General Statutes § 46b-36g, which delineates the standards for the enforceability of prenuptial agreements. The issue of the enforceability of *postnuptial* agreements is not governed by statute and has not previously been addressed by an appellate court in Connecticut. "Because this case involves . . . a question that this court has not previously decided, it is appropriate at the outset to consider generally the enforceability of such agreements." *McHugh* v. *McHugh*, 181 Conn. 482, 485, 436 A.2d 8 (1980). Indeed, the trial court had an affirmative duty to discern and to apply the appropriate standard of enforceability. Although the rules of pleading with respect to both prenuptial agreements and postnuptial agreements normally should be the same, it would be unfair to both the parties and the trial court to limit the available defenses to enforcement of a postnuptial agreement to "special defenses" that have not previously been defined.

agreement, we conclude that postnuptial agreements are subject to special scrutiny and the terms of such agreements must be both fair and equitable at the time of execution and not unconscionable at the time of dissolution. Because the terms of the present postnuptial agreement were unconscionable at the time of dissolution, the trial court properly concluded that the agreement was unenforceable.

The standard applicable to postnuptial agreements presents a question of law, over which our review is plenary. Id., 161. We begin our analysis of postnuptial agreements by considering the public policies served by the recognition of agreements regarding the dissolution of marriage, including prenuptial, postnuptial and separation agreements.

Historically, we have stated that "[t]he state does not favor divorces. . . . Its [public] policy is to maintain the family relation[ship] as a life status." (Citation omitted.) *McCarthy* v. *Santangelo*, 137 Conn. 410, 412, 78 A.2d 240 (1951). Accordingly, prenuptial agreements were generally held to violate public policy if they promoted, facilitated or provided an incentive for separation or divorce. *McHugh* v. *McHugh*, 181 Conn. 482, 488–89, 436 A.2d 8 (1980). Similarly, a separation agreement is not necessarily contrary to public policy unless it is made to facilitate divorce or is concealed from the court. See *Rifkin* v. *Rifkin*, 155 Conn. 7, 9–10, 229 A.2d 358 (1967); *Hooker* v. *Hooker*, 130 Conn. 41, 47, 32 A.2d 68 (1943); *Felton* v. *Felton*, 123 Conn. 564, 568, 196 A. 791 (1938). "While contracts between husband and wife regarding property settlements entered into prior to instituting proceedings for divorce should be carefully examined, they are not necessarily contrary to public policy . . . ." *Koster* v. *Koster*, 137 Conn. 707, 711, 81 A.2d 355 (1951); see also *Lasprogato* v. *Lasprogato*, 127 Conn. 510, 513–14, 18 A.2d 353 (1941); *Weil* v. *Poulsen*, 121 Conn. 281, 286, 184 A. 580 (1936).

More recently, our court has acknowledged that the government has an interest in encouraging the incorporation of separation agreements into decrees for dissolution. See, e.g., *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991) ("private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine" [internal quotation marks omitted]). Postnuptial agreements may also encourage the private resolution of family issues. In particular, they may allow couples to eliminate a source of emotional turmoil—usually, financial uncertainty—and focus instead on resolving other aspects of the marriage that may be problematic. By alleviating anxiety over uncertainty in the determination of legal rights and obligations upon dissolution, postnuptial agreements do not encourage or facilitate dissolution; in fact, they harmonize with our public policy favoring enduring marriages. "Such contracts may inhibit the dissolution of marriage, or may protect the interests of third parties such as children from a prior relationship." *Ansin* v. *Cravin-Ansin*, 457 Mass. 283, 289, 929 N.E.2d 955 (2010).

Postnuptial agreements are consistent with public policy; they realistically acknowledge the high incidence of divorce and its effect upon our population. We recognize "the reality of the increasing rate of divorce and remarriage." *Heuer* v. *Heuer*, 152 N.J. 226, 235, 704 A.2d 913 (1998). "[R]ecent statistics on divorce have forced people to deal with the reality that many marriages do not last a lifetime. As desirable as it may seem for couples to embark upon marriage in a state of optimism and hope, the reality is that many marriages end in divorce. There is a growing trend toward serial marriage; more people expect to have more than one spouse during their lifetime." T. Perry, "Dissolution Planning in Family Law: A Critique of Current Analyses and a Look toward the Future," 24 Fam. L.Q. 77, 82

(1990). "[B]oth the realities of our society and policy reasons favor judicial recognition of prenuptial agreements. Rather than inducing divorce, such agreements simply acknowledge its ordinariness. With divorce as likely an outcome of marriage as permanence, we see no logical or compelling reason why public policy should not allow two mature adults to handle their own financial affairs. . . . The reasoning that once found them contrary to public policy has no place in today's matrimonial law." (Internal quotation marks omitted.) *Brooks* v. *Brooks*, 733 P.2d 1044 1050–51 (Alaska 1987). Postnuptial agreements are no different than prenuptial agreements in this regard.

Having determined that postnuptial agreements are consistent with public policy, we now must consider what standards govern their enforcement. Neither the legislature nor this court has addressed this question. To aid in our analysis of the enforceability of postnuptial agreements, we review our law on the enforceability of prenuptial agreements.[4] Two different sets of principles govern decisions as to the enforceability of a prenuptial agreement; the date of the execution of the agreement determines which set of principles controls.

Prenuptial agreements entered into on or after October 1, 1995, are governed by the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq. The statutory scheme provides that a prenuptial agreement is unenforceable when: (1) the challenger did not enter the agreement voluntarily; (2) the agreement was

---

[4] We do not review our law on the enforceability of separation agreements, which are distinct from both prenuptial and postnuptial agreements and are entered into when spouses have determined to dissolve their marriage. We merely note that their enforcement is governed by General Statutes § 46b-66 (a), which provides in relevant part that "where the parties have submitted to the court an agreement concerning . . . alimony or the disposition of property, the court shall . . . determine whether the agreement of the spouses is fair and equitable under all the circumstances. . . ."

unconscionable when executed or enforced; (3) the challenger did not receive "a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party" before execution of the agreement; or (4) the challenger did not have "a reasonable opportunity to consult with independent counsel." General Statutes § 46b-36g; see also *Friezo* v. *Friezo*, 281 Conn. 166, 182, 914 A.2d 533 (2007).

Prenuptial agreements entered into prior to October 1, 1995, however, are governed by the common law, which we analyzed in *McHugh* v. *McHugh*, supra, 181 Conn. 482. In *McHugh*, we explicitly determined that, although a prenuptial agreement "is a type of contract and must, therefore, comply with ordinary principles of contract law" the validity of such a contract depends on the circumstances of the particular case. Id., 486. Summarizing, we stated: "[Prenuptial] agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." Id., 485–86.

"To render unenforceable an otherwise valid [prenuptial] agreement, a court must determine: (1) the parties' intent and circumstances when they signed the [prenuptial] agreement; (2) the circumstances of the parties at the time of the dissolution of the marriage; (3) whether those circumstances are 'so far beyond' the contemplation of the parties at the time of execution; and (4) if the circumstances are beyond the parties' initial contemplation, whether enforcement would cause an injus-

tice." *Crews* v. *Crews*, supra, 295 Conn. 168. We further note that "[i]t is additionally clear that the party seeking to challenge the enforceability of the [prenuptial] contract bears a heavy burden. . . . [W]here the economic status of [the] parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice. Absent such unusual circumstances, however, [prenuptial] agreements freely and fairly entered into will be honored and enforced by the courts as written. . . . This heavy burden comports with the well settled general principle that [c]ourts of law must allow parties to make their own contracts." (Citation omitted; internal quotation marks omitted.) Id., 169.

Although we view postnuptial agreements as encouraging the private resolution of family issues, we also recognize that spouses do not contract under the same conditions as either prospective spouses or spouses who have determined to dissolve their marriage. The Supreme Judicial Court of Massachusetts has noted that a postnuptial "agreement stands on a different footing from both a [prenuptial agreement] and a separation agreement. Before marriage, the parties have greater freedom to reject an unsatisfactory [prenuptial] contract. . . .

"A separation agreement, in turn, is negotiated when a marriage has failed and the spouses intend a permanent separation or marital dissolution. . . . The circumstances surrounding [postnuptial] agreements in contrast are pregnant with the opportunity for one party to use the threat of dissolution to bargain themselves into positions of advantage. . . .

"For these reasons, we join many other [s]tates in concluding that [postnuptial] agreements must be carefully scrutinized." (Citations omitted; internal quotation marks omitted.) *Ansin* v. *Cravin-Ansin*, supra, 457

Mass. 289–90. The Appellate Division of the New Jersey Superior Court has also recognized this "contextual difference" and has noted that a wife "face[s] a more difficult choice than [a] bride who is presented with a demand for a pre-nuptial agreement. The cost to [a wife is] . . . the destruction of a family and the stigma of a failed marriage." *Pacelli* v. *Pacelli*, 319 N.J. Super. 185, 190, 725 A.2d 56 (App. Div.), cert. denied, 161 N.J. 147, 735 A.2d 572 (1999). A spouse who bargains a settlement agreement, on the other hand, "recogniz[es] that the marriage is over, can look to his or her economic rights; the relationship is adversarial." Id., 191. Thus, a spouse enters a postnuptial agreement under different conditions than a party entering either a pre-nuptial or a separation agreement. *Davis* v. *Miller*, 269 Kan. 732, 739, 7 P.3d 1223 (2000) ("[p]arties entering into a postmarital agreement are in a vastly different position than parties entering into a [prenuptial] agreement").

Other state courts have not only observed that spouses contract under different conditions; they have also observed that postnuptial agreements "should not be treated as mere 'business deals.' " *Stoner* v. *Stoner*, 572 Pa. 665, 672–73, 819 A.2d 529 (2003). They recognize that, just like prospective spouses, "parties to these agreements do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust . . . ." (Internal quotation marks omitted.) Id., 673; see also *Ansin* v. *Cravin-Ansin*, supra, 457 Mass. 290–94 (spouses have "confidential relationship" and " 'stand as fiduciaries to each other' "). "Ordinarily and presumptively, a confidential relation or a relationship of special confidence exists between husband and wife. It includes, but is not limited to, a fiduciary duty between the spouses, of the highest degree." 41 Am. Jur. 2d 72, Husband and Wife § 69 (2005).

Prospective spouses share a "confidential relationship"; *Friezo* v. *Friezo*, supra, 281 Conn. 189; but spouses share the institution of marriage, "one of the most fundamental of human relationships . . . ." *Davis* v. *Davis*, 119 Conn. 194, 203, 175 A. 574 (1934). Marriage is "intimate to the degree of being sacred. It is an association that promotes a way of life . . . a harmony in living . . . a bilateral loyalty . . . . *Griswold* v. *Connecticut*, 381 U.S. 479, 486, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). Courts simply should not countenance either party to such a unique human relationship dealing with each other at arms' length." (Internal quotation marks omitted.) *Billington* v. *Billington*, supra, 220 Conn. 221. "Although marital parties are not necessarily in the relationship of fiduciary to beneficiary . . . [full and frank] disclosure is required of such parties when they come to court seeking to terminate their marriage." Id.

Because of the nature of the marital relationship, the spouses to a postnuptial agreement may not be as cautious in contracting with one another as they would be with prospective spouses, and they are certainly less cautious than they would be with an ordinary contracting party. With lessened caution comes greater potential for one spouse to take advantage of the other. This leads us to conclude that postnuptial agreements require stricter scrutiny than prenuptial agreements. In applying special scrutiny, a court may enforce a postnuptial agreement only if it complies with applicable contract principles,[5] and the terms of the agreement

---

[5] The defendant also argues that the trial court improperly concluded that the postnuptial agreement at issue failed to comply with contract principles because it lacked adequate consideration. Because we conclude that the trial court properly found that the present agreement was unenforceable, we need not address whether the agreement also could have failed for lack of consideration.

General Statutes § 46b-36c, however, expressly provides that prenuptial agreements are enforceable without consideration. Because no similar statute exists for postnuptial agreements, and because such agreements gener-

are both fair and equitable at the time of execution and not unconscionable at the time of dissolution.

We further hold that the terms of a postnuptial agreement are fair and equitable at the time of execution if the agreement is made voluntarily, and without any undue influence, fraud, coercion, duress or similar defect. Moreover, each spouse must be given full, fair and reasonable disclosure of the amount, character and value of property, both jointly and separately held, and all of the financial obligations and income of the other spouse. This mandatory disclosure requirement is a result of the deeply personal marital relationship.[6]

ally must comply with contract principles, the present agreement would require adequate consideration to be enforceable.

"Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 440–41, 927 A.2d 843 (2007); *State National Bank* v. *Dick*, 164 Conn. 523, 529, 325 A.2d 235 (1973); see also *Finlay* v. *Swirsky*, 103 Conn. 624, 631, 131 A. 420 (1925). A release by one spouse of his or her interest in the estate of the other spouse, in exchange for a similar release by the other spouse, may constitute adequate consideration. See *People's Bank of Red Level* v. *Barrow & Wiggins*, 208 Ala. 433, 435, 94 So. 600 (1922); 41 Am. Jur. 2d 71, supra, § 67. In the present case, the plaintiff released, inter alia, her right to alimony and her interest in the defendant's car wash business, in exchange for, inter alia, the defendant's right to alimony and his release of the plaintiff's liability for the defendant's personal and business loans. Although the trial court found that the present agreement lacked adequate consideration, the agreement would not fail for lack of consideration.

In the present case, the defendant does not argue that a promise to remain married constitutes adequate consideration, and the postnuptial agreement does not refer to any promise to remain married or right to dissolution of marriage. Thus, for purposes of the present dispute, it is irrelevant whether a spouse's forbearance from bringing a claimed dissolution action and the continuation of the marriage provides adequate consideration for a postnuptial agreement.

[6] The defendant also argues that the trial court improperly determined that the agreement was unenforceable because the plaintiff did not consult with an attorney. The record, the defendant argues, establishes that the plaintiff had ample time to consult with an attorney, as stated in the text of the agreement itself. Because we conclude that the trial court properly found that the agreement was unenforceable, we do not address this argument beyond noting that, in evaluating the circumstances surrounding a

Just as "[t]he validity of a [prenuptial] contract depends upon the circumstances of the particular case"; *McHugh* v. *McHugh*, supra, 181 Conn. 485; in determining whether a particular postnuptial agreement is fair and equitable at the time of execution, a court should consider the totality of the circumstances surrounding execution. A court may consider various factors, including "the nature and complexity of the agreement's terms, the extent of and disparity in assets brought to the marriage by each spouse, the parties' respective age, sophistication, education, employment, experience, prior marriages, or other traits potentially affecting the ability to read and understand an agreement's provisions, and the amount of time available to each spouse to reflect upon the agreement after first seeing its specific terms . . . [and] access to independent counsel prior to consenting to the contract terms." Annot., 53 A.L.R.4th 92–93, § 2 [a] (1987); id. (discussing factors that courts have considered in evaluating fairness of circumstances surrounding execution of prenuptial agreement).

With regard to the determination of whether a postnuptial agreement is unconscionable at the time of dissolution, "[i]t is well established that [t]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." (Internal quotation marks omitted.) *Crews* v. *Crews*, supra, 295 Conn. 163. "The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 89, 612 A.2d 1130 (1992).

Unfairness or inequality alone does not render a postnuptial agreement unconscionable; spouses may agree

particular agreement, the court should examine the parties' knowledge of their rights and obligations and whether they had a reasonable opportunity to confer with independent counsel.

on an unequal distribution of assets at dissolution. "[T]he mere fact that hindsight may indicate the provisions of the agreement were improvident does not render the agreement unconscionable." (Internal quotation marks omitted.) *Lipic* v. *Lipic*, 103 S.W.3d 144, 150 (Mo. App. 2003). Instead, the question of whether enforcement of an agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice. *Crews* v. *Crews*, supra, 295 Conn. 163. Marriage, by its very nature, is subject to unforeseeable developments, and no agreement can possibly anticipate all future events. Unforeseen changes in the relationship, such as having a child, loss of employment or moving to another state, may render enforcement of the agreement unconscionable.

II

Now that we have set forth the applicable legal standards for postnuptial agreements, we turn to the present case and address the question of whether the trial court properly concluded that the parties' postnuptial agreement should not be enforced.

Although we generally review a trial court's discretionary decision in a domestic relations case using the clearly erroneous standard of review; *Kiniry* v. *Kiniry*, 299 Conn. 308, 315–16, 9 A.3d 708 (2010); in the present case, we must apply the legal standards described in this opinion, namely, whether the terms of the agreement were fair and equitable at the time of execution and not unconscionable at the time of dissolution, to the underlying facts. Accordingly, the question of whether the agreement was enforceable is a mixed question of fact and law subject to plenary review. See *Friezo* v. *Friezo*, supra, 281 Conn. 180.

We therefore provide the following additional facts. Although the value of the parties combined assets is

$927,123, the last addendum to the agreement, dated May 18, 1989, provides that the plaintiff will receive a cash settlement of only $75,000. This addendum was written prior to the initial success of the car wash business in the early 1990s, the birth of the parties' son in 1991, when the parties were forty-one years old, and the subsequent deterioration of the business in the 2000s. At the time of trial, the parties were both fifty-seven years old. Neither had a college degree. The defendant had been steadily employed by the car wash business since 1973. The plaintiff had worked for that business for thirty-five years, providing administrative and book-keeping support, and since approximately 2001, when the business began to deteriorate, the plaintiff had managed all business operations excluding maintenance. In 2004, the plaintiff also had worked outside of the business in order to provide the family with additional income. Since approximately 2007, when the plaintiff stopped working for the business, the defendant had not been able to complete administrative or bookkeeping tasks, and had not filed taxes.

The trial court found that "[t]he economic circumstances of the parties had changed dramatically since the execution of the agreement" and that "enforcement of the postnuptial agreement would have worked injustice." It, therefore, concluded that the agreement was unenforceable. Although the trial court did not have guidance on the applicable legal standards for postnuptial agreements, which we set forth today, we previously have determined that the question of whether enforcement of a prenuptial agreement would be unconscionable is analogous to determining whether enforcement would work an injustice. *Crews* v. *Crews*, supra, 295 Conn. 163. Thus, the trial court's finding that enforcement of the postnuptial agreement would work an injustice was tantamount to a finding that the agreement was unconscionable at the time the defendant sought

to enforce it. We review the question of unconscionability as a matter of law. The facts and circumstances of the present case clearly support the findings of the trial court that, as a matter of law, enforcement of the agreement would be unconscionable. We therefore do not need to remand this case to the trial court because its findings satisfy the test for enforceability, which we articulate today. Accordingly, we hold that the trial court properly concluded that the agreement was unenforceable.

The judgment is affirmed.

In this opinion the other justices concurred.