9th Circuit — Nashua Probate Division
No. 2012-368

IN RE ESTATE OF RICHARD B. WILBER

Argued: April 11, 2013
Opinion Issued: August 21, 2013

*Ransmeier & Spellman, P.C.*, of Concord (*Frank E. Kenison* and *John T. Alexander* on the brief, and *Mr. Alexander* orally), for the respondent.

*Upton & Hatfield, LLP*, of Concord (*Douglas S. Hatfield* and *Matthew R. Serge* on the brief, and *Mr. Hatfield* orally), for the petitioner.

HICKS, J. The petitioner, Estate of Richard Wilber (Richard's Estate), appeals a decision of the 9th Circuit — Nashua Probate Division (*O'Neill*, ·J.) allowing the respondent, Estate of Josephine Wilber (Josephine's Estate), to claim a statutory share under RSA 560:10 (2007) of certain real property located in Hillsborough. We reverse and remand.

I

The following facts are undisputed. Richard and Josephine Wilber were married for approximately fifty years. Richard owned property in both Maryland and New Hampshire. On March 19, 2007, the Wilbers executed a contract (the Agreement) in which Richard agreed to transfer his Maryland property to Josephine and she, in turn, agreed to allow him to live in the house on the property until his death or until he no longer wished to live there. Richard also agreed not to make any claims on the Maryland property during his life or "after [his] death," and Josephine, in return, agreed not to make any claims on Richard's New Hampshire property (the Property) during her life or "after [her] death."

Richard died testate on October 18, 2010, omitting Josephine from his will. The executor of Richard's estate in Maryland, his state of domicile, filed ancillary administration in the 9th Circuit — Nashua Probate Division to distribute property he owned in New Hampshire. In December 2010, Josephine filed a waiver by surviving spouse in the probate division, seeking a statutory share of the Property under RSA 560:10, which allows a surviving spouse to waive the decedent spouse's will and take a specified portion of the estate. Josephine died on March 12, 2011, leaving the executor of her estate, Rosemary Heyne, to pursue her claim. Richard's Estate opposed the waiver on several grounds, among them: (1) Josephine had already petitioned the Orphans' Court for Prince George's County, Maryland for a statutory share of his estate, and had been denied for untimeliness; and (2) Josephine waived her right to pursue a statutory share by promising in the Agreement to make no claims on the Property during her life or after death. The probate division disagreed on both grounds, ruling that it had ancillary jurisdiction over the Property and that the Agreement did not satisfy "the necessary criteria to be a valid and enforceable postnuptial agreement." This appeal followed.

## II

Richard's Estate argues that the trial court erred in failing to enforce the Property Agreement. Josephine's Estate, on the other hand, argues that: (1) New Hampshire has not recognized the validity of postnuptial agreements and this court should not do so absent legislative enactment; and (2) the trial court committed no error in finding the agreement fundamentally unfair and, thus, unenforceable.

### A

As the name suggests, a postnuptial agreement "is an agreement that determines a couple's rights and obligations upon divorce" or death, but, unlike an antenuptial agreement, "is entered into after a couple weds but before they separate." Williams, *Postnuptial Agreements*, 2007 WIS. L. REV. 827, 828 (2007).

Josephine's Estate contends, at the outset, that although Maryland recognizes postnuptial agreements, it is "[d]oubtful" that Maryland courts would have enforced the Agreement. Richard's Estate does not explicitly disagree, but rather cites New Hampshire precedents to support its position that the Agreement should be enforced. Because neither party has asked us to apply Maryland law to determine whether the Agreement bars Josephine's Estate's claim to a statutory share, we will apply the common law of New Hampshire to decide that question. *See Centronics, Corp. v. Genicom Corp.*, 132 N.H. 133, 139 (1989) ("Since the New York decisions are not at odds with our own, . . . and since neither party has suggested that the relevant substantive law differs between the two jurisdictions, we will assume that to whatever extent the governing foreign law has not been proven it is identical to our own.").

Postnuptial agreements are neither prohibited nor specifically authorized by our statutes, *cf.* RSA 460:2-a (2004) (recognizing antenuptial agreements), and we have had no occasion to address them under our common law. Courts and legislatures long ago abandoned the common law rule that a husband and wife could not contract with one another. *See Adams v. Adams*, 80 N.H. 80, 86 (1921). The modern view is that spouses may freely enter contractual relationships, and courts will uphold them if they satisfy the criteria of contract formation and are otherwise fair. *See id.*; Williams, *supra* at 838-39. As early as 1900, in *Foote v. Nickerson*, 70 N.H. 496 (1900), we signaled our willingness to give effect to postnuptial agreements when we stated that "[a]n agreement renouncing marital rights is void," but that "[a]n agreement touching property rights may be valid." *Foote*, 70 N.H. at 518. Similarly, in *Hill v. Hill*, 74 N.H. 288 (1907), we suggested that contracts between a husband and wife may be upheld as

long as they did not "contemplate a renunciation of marital . . . rights." *Hill*, 74 N.H. at 290. Although, as in *Foote*, the court in *Hill* did not expressly consider whether spouses "can make a valid agreement between themselves touching their respective rights in each other's property," *id.*, the analysis in *Hill* essentially assumed that they could do so. *See id.* at 290-91.

In recent years, courts have generally recognized and enforced postnuptial agreements, even in the absence of express legislative approval. *See, e.g., In re Marriage of Traster*, 291 P.3d 494, 501, 512 (Kan. Ct. App. 2012); *Ansin v. Craven-Ansin*, 929 N.E.2d 955, 961, 969 (Mass. 2010); *In re Marriage of Friedman*, 122 Cal. Rptr. 2d 412, 418 (Ct. App. 2002). One recent example is *Bedrick v. Bedrick*, 17 A.3d 17 (Conn. 2011), a case in which the Connecticut Supreme Court opined that "[p]ostnuptial agreements are consistent with public policy" because they "realistically acknowledge the high incidence of divorce" and "allow two mature adults to handle their own financial affairs." *Bedrick*, 17 A.3d at 24 (quotation omitted); *accord, e.g., In re Bulova's Will*, 220 N.Y.S.2d 541, 548 (App. Div. 1961) (postnuptial agreement is enforceable, rendering widow's right of election void).

█ We find no compelling reason to depart from this trend. Postnuptial agreements give married persons the flexibility to dispose of their property and establish their rights and obligations upon death or marital dissolution, given their particular life circumstances. While the default rules applying to divorce or death are designed to ensure a fair outcome in often delicate situations, *see, e.g.*, RSA 458:16-a (2004) (presumption that equal distribution of marital property is equitable), there is no reason why they should, in every case, override the mutual, agreed-upon will of consenting adults. *See Bratton v. Bratton*, 136 S.W.3d 595, 604 n.2 (Tenn. 2004) (noting the "many cases upholding post-nuptial agreements in which the parties mutually release claims to each other's property in the event of death"). We hold, therefore, that postnuptial agreements may be enforced in New Hampshire.

B

█ We must now determine whether to enforce the agreement at issue. At the outset, we note that Josephine's Estate contends that its attempt to take a statutory share under RSA 560:10 does not constitute a "claim" on the Property for the purpose of the Agreement. We disagree. The relevant clause of the Agreement states: "I . . . agree not to make any claims on [the Property] while I am living or after my death." A "claim" is defined broadly: "The assertion of an existing right; . . . [a] demand for money, property, or a legal remedy to which one asserts a right." BLACK'S LAW DICTIONARY

281-82 (9th ed. 2009). Josephine's Estate's attempt to take an interest in the Property pursuant to RSA 560:10 falls squarely within this definition as the "assertion of an existing right."

Turning now to the central issue in this case, Richard's Estate argues that the Agreement is enforceable because it "was both procedurally and substantively fair to both parties." The trial court disagreed, concluding that the Agreement lacked "fundamental fairness in that there is no accompanying financial disclosure document or any indication that one was provided, and there was no indication that Mrs. Wilber was provided with or offered legal counsel." Josephine's Estate contends that the trial court "was justified in finding that [Richard's] conduct fell short of the scrupulously transparent and fair behavior required of spouses when they contract with one another."

Our standard in review of a probate court decision is determined by statute: "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2007). "Consequently, we will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re Angel N.*, 141 N.H. 158, 161 (1996) (quotation and brackets omitted).

Other state courts take different approaches to reviewing postnuptial contracts. Some require greater indicia of fairness than that which applies to antenuptial contracts, while others analyze both antenuptial and postnuptial contracts under the same standard. *Compare, e.g., Ansin*, 929 N.E.2d at 962 n.8, 969 n.19 (concluding that principles applicable to antenuptial and postnuptial agreements "are not the same in all respects" and noting, as an example, that parties to the former are "free not to marry" (quotation omitted)), *and* Minn. Stat. Ann. § 519.11 (West 2006) (imposing more stringent requirements for postnuptial contracts than for antenuptial contracts), *with Stoner v. Stoner*, 819 A.2d 529, 533 n.5 (Pa. 2003) ("[T]he principles applicable to antenuptial agreements are equally applicable to postnuptial agreements, although the circumstances may slightly differ.").

■ ■ We look to principles governing antenuptial agreements for guidance. Ordinary principles of contract law govern antenuptial agreements. *See Norberg v. Norberg*, 135 N.H. 620, 623 (1992). Unlike parties to a commercial contract, however, spouses are traditionally regarded as fiduciaries of one another, and, therefore, often do not enter into agreements from arm's length. *See* 41 C.J.S. *Husband and Wife* § 121, at 492 (2006) ("A confidential or fiduciary relationship is generally deemed to exist between a prospective husband and wife executing an antenuptial

agreement . . . .”). Because the State has a special interest in the subject matter of antenuptial agreements, courts scrutinize them more closely than ordinary commercial contracts. *In re Estate of Hollett*, 150 N.H. 39, 42 (2003). That said, an antenuptial contract “carries with it a presumption of validity.” *In the Matter of Yannalfo and Yannalfo*, 147 N.H. 597, 599 (2002); *see MacFarlane v. Rich (MacFarlane)*, 132 N.H. 608, 614 (1989). As a result, the party seeking invalidation of the agreement must prove that: “(1) the agreement was obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of a material fact; (2) the agreement is unconscionable; or (3) the facts and circumstances have so changed since the agreement was executed as to make the agreement unenforceable.” *Yannalfo*, 147 N.H. at 599; *see MacFarlane*, 132 N.H. at 614. Because of the fiduciary nature of the marital relationship, “the parties must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with *fairness* being the ultimate measure.” *In re Estate of Hollett*, 150 N.H. at 42-43 (quotation omitted).

Here, we need not decide whether postnuptial contracts must be subject to scrutiny beyond that which applies to antenuptial contracts. That is because Josephine’s Estate, as the party challenging the Agreement, failed to meet its burden to demonstrate that the Agreement was unfair to Josephine under either standard. No evidence was introduced suggesting fraud, mistake, or duress. *See Yannalfo*, 147 N.H. at 599. The only evidence touching upon the circumstances surrounding the Agreement’s formation was the testimony of Robert Wilber, Richard’s son, that Josephine — not Richard — both requested the Agreement be drawn up and dictated its terms. Moreover, the fact that there is no financial disclosure document accompanying the Agreement does not suffice to show either that a “material” fact was withheld from Josephine or that the agreement was “obtained through” such nondisclosure. *Id.* Nor does the fact that Josephine was not provided with or offered legal counsel invalidate the Agreement. Although hiring independent counsel would have “go[ne] a long way toward ensuring the enforceability of [the] agreement,” *Ansin*, 929 N.E.2d at 963 n.9, Josephine and Richard were free to form a contract without doing so. *See Stoner*, 819 A.2d at 532 (noting that *per se* requirement of consultation with independent legal counsel “would be a paternalistic and unwarranted interference with the parties’ freedom to contract”).

Furthermore, nothing in the record indicates that Josephine did not understand the financial implications of giving up her rights in the New Hampshire property in exchange for obtaining title to the Maryland property. Indeed, as noted above, she was married to Richard for approxi-

mately fifty years and, at least for some time in the later years of the marriage, paid their bills. *See Button v. Button*, 388 N.W.2d 546, 550 (Wis. 1986) (noting that "independent knowledge of the opposing spouse's financial status" may be a "substitute for disclosure"). Nor is there any evidence that the exchange was unconscionable because of some gross inequality in the value of their respective rights under the Agreement. Thus, Josephine's Estate failed to meet its burden to show the agreement is unenforceable. We conclude, therefore, that the trial court's decision to the contrary is unsupported by the evidence.

Josephine's Estate also contends that Richard breached the Agreement "[b]y refusing to perform his obligations under the Property Agreement without additional consideration," thus releasing her from her obligation to make no claims against the Property. This argument appears to rest on the fact that, upon transferring the deed to the Maryland property to Josephine, Richard demanded that she promise not to require him to make repairs on it and not to divorce him. Josephine's Estate concedes, however, both that Richard kept his promise to convey title to the Maryland property to Josephine and that she accepted title. *Cf. Keshishian v. CMC Radiologists*, 142 N.H. 168, 173 (1997) ("[A] party cannot treat a contract as binding and as rescinded at the same time." (quotation and brackets omitted)). Having accepted his performance, Josephine remained obligated to perform her end of the bargain.

In light of the foregoing, we reverse the ruling of the trial court and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

DALIANIS, C.J., and CONBOY, LYNN and BASSETT, JJ., concurred.