NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court–Manchester Family Division
No. 2014-0794


IN THE MATTER OF MARIANNA NIZHNIKOV AND ALEXANDER NIZHNIKOV

Argued: October 8, 2015
Opinion Issued: January 26, 2016

Crusco Law Office, PLLC, of Bedford (Kysa M. Crusco and Kimberly A. Shaughnessy on the brief, and Ms. Crusco orally), for the petitioner.


Hamblett & Kerrigan, P.A., of Nashua (Kevin P. Rauseo and Andrew J. Piela on the brief, and Mr. Rauseo orally), for the respondent.

CONBOY, J. The respondent, Alexander Nizhnikov, appeals the final order of the Circuit Court (Cooper, M., approved by Carbon, J.) in his divorce from the petitioner, Marianna Nizhnikov. He contends that the trial court erred by: (1) refusing to enforce the parties' prenuptial agreement; (2) awarding alimony to the petitioner; (3) ordering him to pay for the petitioner's health insurance; (4) ordering him to pay for the lease of the petitioner's vehicle; (5) issuing a mutual restraining order; (6) issuing a parenting plan that allowed the petitioner to eventually have "near equal" parenting time; (7) ordering him to pay 100 percent of the children's uninsured medical expenses and co-parenting counseling; (8) refusing to require the parties to live a certain geographical distance from one another; and (9) admitting into evidence a New Hampshire Division for Children, Youth and Families (DCYF) administrative appeal. We affirm in part, reverse in part, vacate in part, and remand.

The trial court found the following relevant facts. The respondent and petitioner began their romantic relationship in 2003, while the petitioner was living in Russia and the respondent was living in the United States. They became engaged in October 2005 and agreed to get married in Russia. Afterward, they began investigating how they could get married in Russia. During this time, the petitioner remained in Russia, but the two would visit each other in both Russia and the United States.

In December 2005, the respondent informed the petitioner that he would require a prenuptial agreement before being married, because he had three children whom he wanted to protect in the event the two divorced. The parties discussed their respective financial positions, and the petitioner agreed to sign a prenuptial agreement.

The respondent retained counsel to prepare the prenuptial agreement; counsel sent the respondent a draft agreement on January 18, 2006. The respondent immediately forwarded the document to the petitioner, in Russia, and the petitioner had it translated from English into Russian, her primary language. She received the Russian translation of the agreement on January 23. At this time, the parties had no specific plan or date on which to be married. They still desired to be married in Russia.

The petitioner returned to the United States on January 27. The parties went to the Mont Vernon Town Hall to obtain a document stating that the respondent was not married in the United States, which the two understood was necessary in order to be married in Russia. The clerk informed them that she could not provide such a document, but the parties learned that they could be married in Mont Vernon upon production of the petitioner's passport and her divorce decree from a prior marriage in Russia. The parties applied for a marriage license on January 30, and were married, in Mont Vernon, on February 3. The parties signed the prenuptial agreement the day they were married. Although the prenuptial agreement references the attachment of financial statements, the parties did not attach financial statements when they executed the agreement.

We first address the trial court's ruling that the parties' prenuptial agreement was unenforceable. The respondent argues that the trial court erred in declining to enforce the agreement because, given that the parties had no prior plans to be married when the agreement was signed, the timing of the agreement's execution was not an issue. The respondent also argues that the petitioner had knowledge of the respondent's financial condition or, in the alternative, waived her right to a financial disclosure. The petitioner argues that the trial court correctly considered the lack of financial statements, together with the timing of the agreement's execution, and properly declined to enforce the agreement.

2

RSA 460:2-a (2004) permits parties to enter into a written contract "in contemplation of marriage." A prenuptial agreement is presumed valid unless the party seeking the invalidation of the agreement proves that: (1) the agreement was obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of a material fact; (2) the agreement is unconscionable; or (3) the facts and circumstances have so changed since the agreement was executed as to make the agreement unenforceable. In re Estate of Hollett, 150 N.H. 39, 42 (2003). We will defer to the findings of fact made by the trial court unless "they are so plainly erroneous that such findings could not be reasonably made." Id. (quotation omitted). "Consequently, we will not disturb the . . . court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." Estate of Wilber, 165 N.H. 246, 251 (2013) (quotation omitted).

In this case, the trial court did not explicitly state the legal grounds upon which it was refusing to enforce the prenuptial agreement. The court ruled that the agreement was unenforceable based upon the "collapsed time frame" leading up to the marriage, as well as the inadequacy of the financial disclosures, including the fact that the agreement references financial statements that the parties never executed. These concerns suggest that the trial court found that the agreement was obtained involuntarily as a product of duress. See Hollett, 150 N.H. at 42-44; see also In the Matter of Yannalfo and Yannalfo, 147 N.H. 597, 599-600 (2002).

"As a practical matter, the claim of undue duress is essentially a claim that the agreement was not signed voluntarily." Hollett, 150 N.H. at 42 (quotation omitted). To establish duress, a party must ordinarily show that it "involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party." Id. (quotation omitted). "[T]he State has a special interest in the subject matter of prenuptial agreements and courts tend to scrutinize them more closely than ordinary commercial contracts." Id. (quotation and brackets omitted). "Moreover, because such agreements often involve persons in a confidential relationship, the parties must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with fairness being the ultimate measure." Id. at 42-43 (quotation omitted).

"Under the heightened scrutiny afforded to prenuptial agreements, the timing of the agreement is of paramount importance in assessing whether it was voluntary." Id. at 43. "Fairness demands that the party presented with the agreement have an opportunity to seek independent advice and a reasonable time to reflect on the proposed terms." Id. (quotation omitted). "To avoid invalidation on grounds of involuntariness, it has been recommended that the contract should be presented well in advance of the ceremony, usually

thirty days." Id. (quotation and brackets omitted). "Some States, in fact, automatically invalidate any prenuptial agreement signed immediately before a wedding." Id.

However, we have "rejected a per se invalidation of agreements signed immediately before the wedding," instead holding "that each case must be decided upon the totality of its own circumstances." Id. We have suggested that "additional circumstances coupled with . . . timing may compel a finding that a prenuptial agreement was involuntary." Id. (quotation omitted). For example, in Hollett, the wife did not learn that the husband required a prenuptial agreement before the two could marry until less than two days before the wedding, and the agreement was signed the morning of the wedding. Id. at 40. In that case, we observed that, if the wife chose not to sign the agreement, she "stood to face the embarrassment of canceling a two hundred guest wedding." Id. at 44.

In this case, the circumstances leading to the petitioner's signature of the agreement do not support a finding that the petitioner was under undue duress or that she signed it involuntarily. The two had discussed and agreed to enter a prenuptial agreement as early as December 2005. When the petitioner returned to the United States in January 2006, she had already received a copy of the translated agreement, the two still had not set a wedding date, and they were planning to get married in Russia at some unknown future date. They decided to get married in the United States only after speaking with the town clerk in Mont Vernon. In view of the fact that the parties had no immediate plans to be married when the prenuptial agreement was exchanged, the mere fact that it was executed the day they were married does not support invalidating the agreement.

The petitioner argues that she was pressured into signing the agreement because the respondent required it as a condition of the marriage. However, we have stated that "the threat that the marriage would not take place, standing by itself, is insufficient to support a finding of duress." Yannalfo, 147 N.H. at 600. The petitioner also makes reference to the fact that, if the marriage had not taken place, it may have affected her ability to immigrate to the United States. However, she fails to cite where she raised this argument before the trial court, and, therefore, we decline to consider it. See In re Adam M., 148 N.H. 83, 85-86 (2002).

Further, we cannot conclude that the parties' failure to attach financial statements to the agreement, even coupled with the timing of the agreement's execution, rendered it involuntary. With no definite wedding date set at the time the petitioner received the translated agreement, she had ample opportunity to investigate the respondent's finances and to obtain the advice of counsel; the record discloses no effort by the petitioner to do so. She relies on the timing of the agreement's execution and the absence of financial

statements as dispositive evidence that the agreement was obtained involuntarily irrespective of the circumstances. However, "we decline to presume on the evidence presented that the petitioner had insufficient time to consult with an attorney" or otherwise investigate the respondent's finances "had she decided to do so." Yannalfo, 147 N.H. at 600.

Moreover, we note that this is not a case involving unequal education or bargaining power between the parties. See Hollett, 150 N.H. at 44 ("Prenuptial agreements that result from . . . a vast disparity in bargaining power must meet a high standard of procedural fairness."). The court found the petitioner to be "a well-educated, sophisticated individual" who obtained her law degree in Russia. The petitioner worked as "the general manager for the [respondent's] company, overseeing and being responsible for over 200 employees and subcontractors in Russia." Further, "[p]rior to working for [the respondent's] company she owned her own fitness business in Moscow and worked as a logistic group leader for [a] wholesale company in St. Petersburg."

Nor does the evidence support a conclusion that the respondent acted in bad faith in obtaining the petitioner's consent regarding the agreement. In Hollett, the husband knew that his wife opposed a prenuptial agreement, but nonetheless had his attorney draft an agreement a month before the wedding and did not inform her of it until just a few days before the ceremony. Id. We stated that this conduct "raise[d] serious questions regarding his good faith in dealing with" his wife. Id. In this case, however, the respondent approached the petitioner about a prenuptial agreement a few months after their becoming engaged, before any marriage date had been set. He also forwarded the draft agreement to the petitioner "less than an hour after [it was] sent [to him] by his lawyer." The petitioner received the draft agreement 16 days before they were married.

For these reasons, we conclude that the evidence does not support a finding that the agreement was obtained involuntarily as a product of duress.

To the extent that the court may have invalidated the agreement on the separate grounds of nondisclosure of material fact based upon the lack of financial affidavits, we reach the same result. See Wilber, 165 N.H. at 252. We have previously held that "the fact that there is no financial disclosure document accompanying the Agreement does not suffice to show either that a 'material' fact was withheld from [a spouse] or that the agreement was 'obtained through' such nondisclosure." Id. The petitioner admits that the parties discussed their respective assets, and that the respondent did not hide assets of which she later became aware. Additionally, the court found that "[t]he parties discussed their respective financial positions" when discussing whether to enter into the agreement. Regarding the respondent's businesses, the court also found that the petitioner "was aware of the financial condition of the businesses inasmuch as she was the general manager and had full access

5

to all the information" and, "[i]n fact, [the petitioner] prepared the budgets for the businesses."

The petitioner argues that she was unaware of the value of many of the respondent's assets. We conclude, however, that, as recited in the agreement, the petitioner "had a reasonable opportunity to ascertain" the value of the respondent's property "but has declined to examine and investigate and has thereby waived and does hereby waive and relinquish the right to do so." Thus, the petitioner had the opportunity to investigate the respondent's finances, and was free to enter into the contract without doing so. Cf. id. (noting that the parties were not required to hire independent counsel before entering into a postnuptial agreement). Therefore, we conclude that the petitioner waived her right to investigate the value of the respondent's assets, and cannot now claim that the absence of an ascribed value is a material fact that the respondent failed to disclose.

The petitioner also contends that, because the agreement contains the waiver clause but also references financial statements that were not attached, the agreement is ambiguous. The respondent argues that we should not consider this argument because the petitioner did not raise the issue of ambiguity in the trial court. Assuming, without deciding, that the petitioner's argument is properly before us, we disagree that the agreement is ambiguous.

Ordinary principles of contract law govern prenuptial agreements. Id. at 251. "The determination of whether contractual language is ambiguous is . . . a question of law entitled to de novo review." Found. for Seacoast Health v. Hosp. Corp. of America, 165 N.H. 168, 172 (2013). "The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of the language." Id. (quotation omitted). Here, the fact that financial statements were not executed is explained by the waiver provision in the agreement. If financial statements were absolutely required, there would be no need for a provision indicating that the parties have knowledge of the other's property or, in the alternative, waive the opportunity to investigate the same. Therefore, we conclude that the agreement is not ambiguous.

In sum, we conclude that the parties' prenuptial agreement was valid and enforceable, and not the product of duress or obtained through non-disclosure of material fact. Additionally, we decline to consider the petitioner's argument that the respondent still "got a fair deal" despite the trial court's ruling that the agreement was unenforceable: The respondent is entitled to enforce the terms of a valid agreement. Given this conclusion, we vacate the trial court's property distribution and remand for the court to distribute the property consistent with the parties' agreement. Because we remand on this issue, we do not address the respondent's specific arguments regarding alimony, payment of the petitioner's health insurance, or the leased vehicle.

6

Finally, we turn to the respondent's remaining arguments that the trial court erred by: (1) issuing a mutual restraining order; (2) issuing a parenting plan that allowed the petitioner to eventually have "near equal" parenting time; (3) ordering him to pay for 100 percent of the children's uninsured medical expenses and co-parenting counseling; (4) refusing to require the parties to live a certain geographical distance from one another; and (5) admitting a DCYF administrative appeal into evidence.

As the appealing party, the respondent has the burden of demonstrating reversible error. <u>Gallo v. Traina</u>, 166 N.H. 737, 740 (2014). Based upon our review of the trial court's order, the respondent's challenges to it, the record submitted on appeal, and the relevant law, we conclude that he has not demonstrated reversible error on these issues. <u>See</u> <u>id</u>.

<u>Affirmed in part; reversed in part; vacated in part; and remanded</u>.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.